# IN RE JOSEPH W., JR., ET AL.*
## (AC 30476)
## (AC 30477)

Bishop, Harper and Pellegrino, Js.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued January 12—officially released June 8, 2010

*David B. Rozwaski,* for the appellant (respondent mother in AC 30476).

*David J. Reich,* for the appellant (respondent father in AC 30477).

*Jane R. Rosenberg,* assistant attorney general, with whom, on the brief, was *Richard Blumenthal,* attorney general, for the appellee (petitioner in both cases).

*Geraldine M. Menn,* for the minor children in both cases.

*Opinion*

BISHOP, J. The respondent mother, Karin H., and the respondent father, Joseph W., appeal from the judgments of the trial court terminating their parental rights

as to their two children, Joseph, Jr., and Daniel.[1] Because we conclude that the terminations of the rights of both parents were premised on a prior adjudication of neglect that was improperly rendered, we reverse the judgments of the trial court.

The following factual and procedural history is relevant to the respondents' appeals. Joseph, Jr., was born on July 18, 2005, in Scranton, Pennsylvania. The respondents feared that the department of children and families (department) would take Joseph, Jr., from them because the mother's first child had been committed to the custody of the petitioner, the commissioner of children and families. Consequently, on the advice of legal counsel, the respondents traveled to Pennsylvania in an attempt to evade the department. The parents were not successful in their attempt to elude the department. On July 21, 2005, three days after his birth, while still in the hospital, Joseph, Jr., was taken into emergency protective custody by the commonwealth of Pennsylvania, to be transferred to the custody of the petitioner upon the issuance of an order of temporary custody. Also on July 21, 2005, the petitioner took Joseph, Jr., into custody pursuant to an order of temporary custody and filed a neglect petition, on the basis of the doctrine of predictive neglect, premised on allegations regarding the mother's mental health issues[2] and

---

[1] In AC 30476, the respondent mother appeals from the court's judgment terminating her parental rights as to both children. In AC 30477, the respondent father appeals from the court's judgment terminating his parental rights as to both children.

[2] In support of the allegations of predictive neglect, Kathleen Dayner, a social worker with the department, set forth the following history of the mother's involvement with the department. On October 14, 2002, the mother gave birth to her first child, who is not at issue in these appeals. On the day that child was born, that child was taken into the custody of the petitioner on the basis of a referral from the hospital indicating that the mother's "mental health presentation impaired her ability to safely parent her infant child." On February 7, 2003, the mother was diagnosed with schizotypal personality disorder. This disorder is "characterized by unusual, disjointed and peculiar distortions of thinking, understanding and interpersonal rela-

the father's alleged inability to acknowledge the mother's parenting limitations.[3] Joseph, Jr., has remained in the custody of the petitioner throughout the ensuing proceedings leading, ultimately, to this appeal.

Daniel was born on July 20, 2006, in Waterbury. On the same day, while Daniel was still in the hospital, the petitioner took him into custody pursuant to an emergency ninety-six hour administrative hold. See General Statutes § 17a-101g. On July 24, 2006, the petitioner filed a neglect petition and sought an order of temporary custody as to Daniel. The custody order was granted on the same day.[4] The allegations of neglect

tionships." On this basis, the court-appointed psychiatrist opined that the mother "could not be predicted to be able to reliably care for a child" and that "the prognosis for [the mother] to develop abilities in the future is exceedingly poor." The psychiatrist stated that the mother "has demonstrated no ability to change her functioning on the basis of reasoning, advice, counseling or coaching."

In May, 2005, the mother was seen by a different psychiatric specialist who diagnosed her with paranoid schizophrenia and post-traumatic stress disorder. The mother was prescribed medication, which she failed to take. Dayner alleged that the mother had failed to benefit from the psychiatric and medical services provided by the department, and, consequently, the mother's parental rights as to her first child were terminated.

[3] In the petitioner's summary of facts substantiating the allegations of neglect, Kathleen Dayner, a social worker with the department, noted the father's lack of "insight or acceptance" of the mother's "psychiatric impairment and the implications they have for this child." She also noted: "Dr. [Cynthia] Ronan reported to [the department] on [June 28, 2005] that father . . . 'is as unstable as [the mother]'. Dr. Ronan stated [that the father] refused during a prenatal visit to listen to the child's heartbeat saying 'that's too intimate.' " Dayner also stated that the father "has a criminal history dating back to 1971 with charges that include assault, breach of [the] peace, threatening, breaking and entering and resisting arrest."

[4] The basis for the neglect petition as to Daniel was the same as the basis for the petition filed regarding Joseph, Jr.; see General Statutes (Rev. to 2007) § 46b-120 (9) (C); except that it averred that the father "has not demonstrated an ability to care for the child independent of the mother." In the petitioner's summary of facts substantiating the allegations of neglect, in addition to citing to the father's criminal history, Kathleen Dayner, a social worker with the department, stated: "Since the inception of the case involving [Joseph, Jr., the father] has demonstrated during visitation, a refusal or reluctance to feed the child as advised or to follow [child care]

regarding Daniel were essentially the same as those made in the neglect petition regarding Joseph, Jr. As in the case of Joseph, Jr., Daniel has remained in the custody of the petitioner throughout the proceedings leading to this appeal.

On August 2, 2007, at the hearing on the neglect petitions regarding both children and at which the father was present, the mother entered a plea of nolo contendere as to the allegations of neglect. After canvassing the mother, the court, *Wilson, J.*, adjudicated the children neglected pursuant to General Statutes (Rev. to 2007) § 46b-120 (9) (C) and committed the children to the custody of the petitioner. Neither respondent appealed from the neglect judgments.

On November 29, 2007, however, the father filed a motion to open the adjudications of neglect and commitment of the children, alleging that he had attempted to object to the mother's plea on August 2, 2007, but that the court would not allow him to speak.[5] On May 16, 2008, the court, *Bear, J.*, held an evidentiary hearing on the father's motion to open the adjudications of neglect during which the father testified as to what happened at the earlier neglect proceeding, and the transcript of that hearing was introduced into evidence. On May 30, 2008, the court issued an order denying the father's motion to open the judgments of neglect but indicating that if the father filed a pleading seeking a trial on the issue of whether the children were neglected, then the petitioner would have the burden of proving, at the termination trial,[6] that the children

advice given by [the department]. He has also failed to act responsibly resulting in an injury to the child during visitation on [July 19, 2006]."

[5] The father alleged in his motion that "the [c]ourt cautioned [him] to quiet down and [j]udicial [m]arshals prepared to enforce this request."

[6] The petitioner filed petitions to terminate the parental rights of the respondents on December 10, 2007.

were neglected despite the prior adjudications of neglect.[7]

On June 16, 2008, the petitioner filed a motion asking the court to reconsider its May 30, 2008 order requiring that she prove by a fair preponderance of the evidence that the children were neglected at the trial on the petitions to terminate the respondents' parental rights. On June 24, 2008, pursuant to the court's May 30, 2008 order, the father filed a motion seeking a neglect trial, a motion to clarify and an objection to the petitioner's motion for reconsideration. The court, *Bear, J.*, held a hearing on these motions on July 9, 2008. On that date, the court granted the father's motion for a neglect trial but denied the father's other requested relief. At the July 9, 2008 hearing, the court, *Bear, J.*, also found that the father had not stood silent at the August 2, 2007 neglect proceeding and that he did not waive his right to be heard on the neglect matter. The court commented that "[i]f [the father] turns out to have been custodial, then only half of what needed to be done was done

[7] Specifically, the court's order stated: "The respondent father's motion to open the judgment of neglect, filed on November 29, 2007, having been heard by this court, it is hereby ordered that the relief sought in such motion, e.g., that the judgment of neglect be opened, is hereby denied, but such respondent father (but not the respondent mother who did not seek similar relief) shall be permitted on or before August 12, 2008, fourteen days before the termination of parental rights trial scheduled to commence on Tuesday, August 26, 2008, to file a pleading with the court, copies certified to counsel, that he continues to seek a trial on the issue(s) of whether Joseph, Jr., and Daniel were neglected as alleged by [the petitioner] in each respective neglect petition, and if such pleading timely is filed by such respondent father, despite the prior adjudications of neglect and dispositions of commitment entered on or about August 2, 2007, upon the nolo contendere pleas of the mother, at such trial [the petitioner] shall also have the burden to prove by a fair preponderance of the evidence that Joseph, Jr., and Daniel were neglected.

"Such prior commitments of Joseph, Jr., and Daniel to the care, custody and guardianship of [the petitioner] shall remain in effect until further order(s) of this court."

with the mother's nolo." The court also denied the petitioner's motion[8] but clarified its May 30, 2008 ruling, explaining that the issue to be determined was whether the father "was a noncustodial or custodial parent on the date of the filing of each of the [neglect] petitions, since the father's hearing rights in light of the mother's nolo contendere plea would be different depending on his custodial or noncustodial status."

Thereafter, on August 20, 2008, the father filed a motion to bifurcate the neglect and termination of parental rights proceedings, to which the petitioner objected. On August 21, 2008, the petitioner filed another motion asking the court to reconsider its May 30, 2008 order requiring the petitioner to prove at the termination of parental rights hearing that the children had been neglected.[9] By way of a memorandum of decision dated August 25, 2008, the court, *Bear, J.*, denied the father's motion for bifurcation, sustained the petitioner's objection to the motion for bifurcation and denied the petitioner's motion for reconsideration.[10]

On September 4, 2008, the court, *Olear, J.*, commenced the termination hearing, beginning with the issue of whether the father was a custodial parent as of the date that the neglect petitions were filed. The father testified that he was present at the hospital when both Joseph, Jr., and Daniel were born, that he signed acknowledgements of paternity for both children while they were in the hospital and that he was there with them for the duration of their stay in the hospital until they were taken into the custody of the petitioner within a few days of their respective births. The father also testified that it was his understanding that he and the

---

[8] None of the parties appealed from this order.

[9] The petitioner based her motion on this court's decision in *In re Stephen M.*, 109 Conn. App. 644, 953 A.2d 668 (2008), which was released August 12, 2008.

[10] None of the parties appealed from these orders.

mother would raise Joseph, Jr., and Daniel together. After the father testified, the petitioner called Kathleen Dayner, a social worker with the department, to testify. Dayner testified that both parents were considered custodial before the children were taken into the petitioner's custody "because [the parents] were both together."[11] Following the hearing, the court concluded: "[T]he father today has not produced sufficient evidence to meet his burden of having established that he was a custodial parent as contemplated by the Practice Book and by law, and, furthermore, by Judge Bear's order. So, at this point, I'm not finding the father to have been custodial for purposes of the neglect adjudication being required to be remade."

Thereafter, the court granted a motion filed by the petitioner to correct its petition for termination of the respondents' parental rights and to proceed on the basis of the prior adjudications of neglect. Following an evidentiary hearing, the court, by memorandum of decision dated October 1, 2008, terminated the respondents' parental rights as to both Joseph, Jr., and Daniel.[12] These appeals followed.

On appeal, the father claims that the termination of his parental rights was improper because it was premised on a prior finding of neglect in a proceeding in which he was deprived of his right to participate. He claims further that he was entitled to a contested hearing on the neglect petition because he was a custodial parent at the time that the neglect petition was filed.

---

[11] Following the testimonial portion of the hearing, the petitioner seems to have argued that the father was not custodial in that he "came in on the scene from a hospital, and the only involvement [the petitioner] had at the time was with the mother in regard to this case." Such an argument, however, merely serves to undermine the thoroughness of the petitioner's actions to remove the children from their parents on the basis of predictive neglect.

[12] The court rendered judgment of termination of parental rights as to the mother pursuant to General Statutes § 17a-112 (j) (3) (B) (i) and (E) and as to the father pursuant to § 17a-112 (j) (3) (B) (i).

The father also claims that the court improperly found that the department made reasonable efforts to reunify him with his children and that he was unable or unwilling to benefit from services. See General Statutes § 17a-112 (j) (3) (B) (i). The mother claims that the court improperly found that she had failed to achieve a sufficient degree of personal rehabilitation; see General Statutes § 17a-112 (j) (3) (B) (i) and (E); and that it would be in the best interests of the children to terminate her parental rights. Pursuant to the procedural posture of this case, the petitioner did not have to prove at the termination hearing that the children were neglected but only that the children had been found to be neglected in a prior proceeding.[13] Because the neglect adjudications relate to the children, and not to either of the parents; see *In re T.K.*, 105 Conn. App. 502, 505–506, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008);[14] if the father is successful in his claim regarding the deprivation of his rights in the neglect proceeding, the finding of neglect, despite the mother's nolo plea, cannot stand. In other words, a court could not, after an evidentiary hearing in which the father has the right to participate, find that the children were not neglected but also, on the basis of the mother's nolo plea, find that they were neglected. Accordingly, because the neglect adjudications were the factual underpinnings for the termination of the rights of both

[13] On January 8, 2009, the petitioner asked the court to articulate whether "there [was] sufficient evidence presented at the termination of parental rights trial, whereby the trial court could find by a fair preponderance of the evidence that the children were neglected?" The court denied the motion for articulation on the ground that the issue of neglect was not before the court at the termination trial because that issue had been previously adjudicated on August 2, 2007, and the father had not produced sufficient evidence to prove that he was custodial and, therefore, entitled to a contested hearing on neglect.

[14] We note the apparent anomaly that while an adjudication of neglect relates to the status of a child and is, therefore, not premised on the fault of the parents, such a finding can, nevertheless, be used as a basis for terminating a parent's rights.

respondents, if we find that there should be a new neglect proceeding, the termination of the parental rights of both respondents must be reversed.

As a preliminary matter, we note that the petitioner contends that the father's claim constitutes an impermissible collateral attack on the court's prior adjudication of neglect.[15] In so claiming, however, the petitioner mischaracterizes the father's appeal. As part of the father's appeal from the termination of his parental rights, he is contesting the court's determination that he was not a custodial parent as of the date the neglect petitions were filed. He makes this challenge because the petitioner relied on the prior neglect determination as an adjudicative basis for termination.[16]

In support of her argument, the petitioner relies on *In re Stephen M.*, 109 Conn. App. 644, 647, 953 A.2d 668 (2008), in which this court held that a party is barred by the doctrine of collateral estoppel from relitigating a previous finding of neglect during a subsequent termination trial.[17] In *In re Stephen M.*, the trial court had

[15] "The petitioner's claim that a trial court may not reconsider the issue of neglect during a termination of parental rights proceeding presents a mixed question of fact and law because it involves the application of factual determinations to the statutory scheme for the protection of the well-being of children. In such circumstances, an appellate court employs the de novo standard of review." *In re Stephen M.*, 109 Conn. App. 644, 658, 953 A.2d 668 (2008).

[16] Although the father arguably should have appealed immediately from the adjudication of neglect, instead, he timely filed a motion to open that judgment pursuant to General Statutes § 52-212a. It is noteworthy that the petitioner neither filed an objection to the father's motion, nor raised the issue at the hearing on the motion that the father should have previously appealed from the neglect adjudication. The petitioner did not make that argument until she filed a motion for reconsideration on June 16, 2008.

[17] "The applicability of the doctrines of collateral estoppel or res judicata presents a question of law that we review de novo." *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 601, 922 A.2d 1073 (2007). "Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum." (Internal quotation marks omitted.) *Bouchard* v. *Sundberg*, 80 Conn. App. 180, 186, 834 A.2d 744 (2003).

"The common-law doctrine of collateral estoppel, or issue preclusion, embodies a judicial policy in favor of judicial economy, the stability of

disregarded the prior finding of neglect and, accordingly, dismissed the petitions for the termination of the parents' rights. Id. Here, however, the court afforded the father the opportunity to prove, at the termination hearing, that he was a custodial parent at the time that the neglect petitions were filed. Thus, the court effectively opened the judgment of neglect on the basis of the fact that the father may have been a custodial parent at the time and that he had been denied the right to contest the neglect petitions. Accordingly, on the basis of the unique procedural circumstances of this case, the father's claim on appeal does not constitute an impermissible collateral attack on the neglect adjudication.[18]

We now turn to the father's claim that the court improperly concluded that he was not a custodial parent at the time that the neglect petitions were filed. The parties agree that a parent is custodial for the purposes of a neglect adjudication if that parent is responsible for the physical care and supervision of the child.[19]

former judgments and finality. . . . Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment." (Citations omitted; internal quotation marks omitted.) *Lafayette* v. *General Dynamics Corp.*, 255 Conn. 762, 772, 770 A.2d 1 (2001).

Here, in affording the father an opportunity to prove that he was a custodial parent, the court implicitly determined that the issue of neglect had not previously been fully and fairly adjudicated.

[18] The court then ordered the matters consolidated, which further undermines the petitioner's claim that the father is collaterally attacking the judgment of neglect.

[19] We presume that the rationale behind the rule requiring the judicial authority to address its inquiry regarding neglect to the custodial parent was tied to the fact that the custodial parent was in the better position to attest to the condition of the children. This case does not fit readily into that framework for two reasons. First, because the basis for the neglect petitions as to both children was predictive, it cannot be presumed that one parent would be more competent to plead to predictive behavior than the other. Second, here, there is no evidence that either parent had a greater

The father contends that both he and the mother were custodial parents for the purposes of the neglect hearing.[20] He argues that there was no difference between his status and that of the mother because he, like the mother, is the acknowledged parent of both children, he was present at the birth of each child, and he was in the hospital with them until they were each taken into state custody.[21] Thus, he claims that his custodial status cannot reasonably be viewed as any different from the mother's, whose status was unquestioned at the neglect proceedings. We agree.

The father's claim raises a mixed question of law and fact, over which we exercise plenary review. Therefore, "we must decide whether [the court's] conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *In re Haley B.*, 262 Conn. 406, 411, 815 A.2d 113 (2003).

In 2007, Practice Book § 35a-1 (b), subsequently redesignated as Practice Book § 35a-1 (a),[22] provided:

custodial relationship with either child in the hospital in the few days that transpired between birth and removal of the children by the department.

[20] "[A] father, no less than a mother, has a constitutionally protected right to the companionship, care, custody, and management of the children he has sired and raised, [which] undeniably warrants deference and, absent a powerful countervailing interest, protection." (Internal quotation marks omitted.) *Weinberger* v. *Wiesenfeld*, 420 U.S. 636, 652, 95 S. Ct. 1225, 43 L. Ed. 2d 514 (1975).

[21] Curiously, the petitioner contends on appeal that neither parent was custodial at the time the neglect petitions were filed because the petitions were not filed until after the children were taken into custody. If that be the case, it is difficult to rationalize the court's acceptance of the mother's nolo plea at the neglect hearing, as we are not aware of the basis for a court properly to accept a nolo plea to a neglect petition from a noncustodial parent. Therefore, if the mother was not a custodial parent when the neglect petitions were filed, it is questionable as to whether her nolo plea was a proper vehicle for adjudicating the children as neglected.

[22] In 2009, Practice Book § 35a-1 (b) was redesignated Practice Book § 35a-1 (a), with certain revisions for clarification, to require that the judicial authority inquire of the parents or guardian whether or not they admit or deny the allegation of the neglect petition regardless of whether the parent is custodial.

"Notwithstanding any prior statements acknowledging responsibility, the judicial authority shall inquire whether the allegations of the petition are presently admitted or denied. This inquiry shall be made of the *custodial parent* in neglect, uncared for or dependent matters; and of all appearing parents in termination matters." (Emphasis added.) To resolve the father's claims on appeal, we must determine the meaning of "custodial parent" as it is used in this section of the rules of practice.[23]

On January 28, 2010, we asked the court, *Olear, J.*, to articulate the legal and factual bases for its conclusion that the father was not a custodial parent at the time that the neglect petitions were filed. In response, the court stated that the "[f]ather, while represented by competent counsel, elected to stand silent at the time of the neglect adjudication and, by doing so, acknowledged being a noncustodial parent." The court defined the custodian of a minor child as "the parent or person with whom a minor child resides, at all times or from time to time, and who assumes the responsibility for all or part of the day-to-day care and supervision of the child." The court found that the father was present at the births of the children; that both children were taken into the custody of the petitioner prior to their discharge from the hospital; that the father signed an acknowledgement of paternity for each child; and that, prior to the respective orders for temporary custody, there were no court orders establishing the legal custo-

---

[23] "Construction of our rules of practice presents a question of law over which our review is plenary. . . . In construing our rules of practice, we are guided by the principles governing statutory interpretation. . . . Our fundamental objective in interpreting a rule of practice is to ascertain and give effect to the intent of the drafters. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply." (Citations omitted; internal quotation marks omitted.) *Malave* v. *Ortiz*, 114 Conn. App. 414, 417, 970 A.2d 743 (2009).

dian of the children. The court noted the father's failure to introduce any evidence that he and the mother were married, that they resided together or that they intended to reside in the same home with the children upon discharge from the hospital.[24] The court stated that "[t]here was no evidence that [the] father was going to or had prepared to care for his children in his residence at the time the neglect petition was filed or at any foreseeable time in lieu of or in addition to the children being cared for by [the] mother (an acknowledged custodial parent)[25] in her separate residence." The court concluded that the father failed to "introduce any evidence to refute [the] mother's acknowledgement, by entering her plea of nolo contendere, that she was a custodial parent."[26]

We find the court's articulation legally and factually troubling. We first address the court's statement that the father stood silent at the neglect hearing. This finding is belied by Judge Bear's earlier determination, following a hearing in which the transcript of the neglect proceeding was introduced into evidence. Judge Bear stated that "[t]he father, from the transcript, made it clear that he did want to proceed with his rights such as they are

---

[24] It is noteworthy that the petitioner, in her affidavit dated July 24, 2006, seeking out of home placement for Daniel, alleged that the mother and the father did, in fact, reside together and that the parents' misrepresentation of their joint residency was one area of the petitioner's concern. That affidavit was filed simultaneously with the neglect petition as to Daniel.

[25] This statement is troubling, as it seems to suggest that a parent may be considered custodial simply on the basis of his or her willingness to enter a nolo plea. It also begs the question as to what the custodial status of each parent would be if the father had agreed to the nolo plea, but the mother had refused. Would the father then have been considered a custodial parent rather than the mother? The petitioner, the court and the dissent seem to so suggest.

[26] Such reasoning wrongly presumes that only one parent can be custodial. It also presumes that the father had a higher burden than the mother to prove that he was a custodial parent. As noted previously, we know of no legal authority for this presumption.

. . . ." Judge Bear found that the "[f]ather did not stand silent. The transcript reflects that whatever the father was supposed to do, that was not his understanding, and he tried to make that clear to the court from the beginning of the canvass. So, whatever may have been thought, the father made it clear he wanted to have his hearing." Judge Bear further found that "the father has and did not waive [his right to participate in the neglect proceeding] and has pursued his right to be heard on the neglect matter."

The statement of the court, *Olear, J.*, that the father remained silent at the neglect proceeding is further belied by the court's statement on September 4, 2008, in which it said: "On consideration of the testimony put forward today and on a further reading of Judge Bear's order of August 25, 2008, while the court acknowledges [that] *the father may not have waived his rights at the time of the hearing,* the father today has not produced sufficient evidence to meet his burden of having established that he was a custodial parent . . . ." (Emphasis added.) A fair review of the record in this regard reveals that the father not only did not "stand silent" at the neglect hearing but that he attempted, without success, to assert his right to participate in the neglect hearing and to contest the allegations of neglect.

We next turn to the question of whether the father should have been accorded the right to participate in the neglect proceeding because, as noted, if that proceeding was flawed, the findings of neglect could not subsequently and properly be used by the petitioner as an adjudicative allegation in the termination proceedings. Although the rules of practice do not define the term "custodial" for purposes of adjudicating neglect, we find guidance in our statutes and case law.[27] General

---

[27] In analyzing the father's claim that he is a custodial parent, we are mindful that we are dealing with a requirement in the rules of practice that cannot substantively affect a party's statutory or constitutional rights. See *Rosado* v. *Bridgeport Roman Catholic Diocesan Corp.*, 292 Conn. 1, 44, 970

Statutes § 45a-606 provides in relevant part: "The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. . . ." "The right to the custody of a minor child is one of the principal attributes of a guardianship of the person." *Boardman* v. *Boardman*, 135 Conn. 124, 129, 62 A.2d 521 (1948). "Since 1901 the rights of both parents have been equal . . . ." *Dunham* v. *Dunham*, 97 Conn. 440, 442, 117 A. 504 (1922),[28] overruled in part on other grounds by *Freund* v. *Burns*, 131 Conn. 380, 385, 40 A.2d 754 (1944). Parents are joint guardians and have equal and independent rights to their custody. See *Scott* v. *Furrow*, 141 Conn. 113, 119, 104 A.2d 224 (1954). "In a custody dispute, parents stand on equal footing with respect to one another . . . ." *Doe* v. *Doe*, 244 Conn. 403, 476, 710 A.2d 1297 (1998) (*Katz, J.*, concurring in part and dissenting in part).

On the basis of the record before the court at the time of the neglect proceeding, we can discern no distinction in the custodial status of either parent. Both parents were at the hospital together for the births of both children, and they spent equal amounts of time with them before they were taken into custody by the petitioner. In its decision, the courts, *Olear, J.*, and *Bear, J.*, placed a burden on the father to prove that he was a custodial parent even though no court in these proceedings has placed a corresponding burden on the mother. Additionally, we are not aware of any legal authority that stands for the proposition that a parent must prove that he or she is custodial to contest a

A.2d 656, cert. denied sub nom. *Bridgeport Roman Catholic Diocesan Corp.* v. *New York Times Co.*, 558 U.S. 991, 130 S. Ct. 500, 175 L. Ed. 2d 348 (2009).

[28] Prior to 1901, "[p]rimarily the parents [were] entitled to the custody of their minor child, and formerly, in case of controversy, the father to the exclusion of the mother." *Dunham* v. *Dunham*, supra, 97 Conn. 442.

neglect petition. As noted, decisional and statutory law establishes that there is a presumption that the rights of both parents, in regard to their children, are equal.[29] Mindful of these legal parameters, it is difficult to fathom the basis on which the court, in the neglect proceeding, accepted the nolo plea from the mother while denying the father an opportunity to be heard, particularly when, by the testimony of the case social worker, the petitioner considered both parents to be custodial. Because our law provides that the right to custody of the minor child is equal in both parents,[30] the mother's "acknowledgment" that she was custodial does not render the father noncustodial and should not place on him a burden to prove that he is custodial, a presumption that exists in our jurisprudence.

On the basis of the foregoing, we conclude that the father enjoyed the same custodial status as the mother at the time the neglect petitions were filed and that he was entitled to contest the allegations of neglect. Because the father is entitled to contest the neglect allegations, the termination of the respondents' parental rights must be reversed, as the terminations were premised on improper adjudications of neglect.

---

[29] The dissent sets forth, with no legal support, several potential items that the father could have raised as proof that he was a custodial parent, such as the purchase of a child safety seat or a crib. Whether or not there is any legal basis for the dissent's proposition, it is noteworthy that there is no evidence in the record that the mother had presented such evidence, or any evidence whatsoever, to establish that she was a custodial parent.

[30] The United States Supreme Court held in *Stanley* v. *Illinois*, 405 U.S. 645, 658, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972), that a conclusive presumption that unwed fathers are unfit to have custody of their children violated the fourteenth amendment. The court held that both the due process clause and the equal protection clause of the fourteenth amendment entitle the father of an illegitimate child to the same hearing as a legal father to determine his fitness before being deprived of custody of his child. Id., 649. In defining the right at stake, the court held that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' . . . 'basic civil rights of man,' . . . ." (Citations omitted.) Id., 651.

The judgments are reversed and the cases are remanded for further proceedings consistent with this opinion.

In this opinion HARPER, J., concurred.

PELLEGRINO, J., dissenting. I respectfully disagree with the majority that the trial court, *Olear, J.,* erred when it determined that the respondent father, Joseph W., was not a custodial parent. As Judge Olear carefully pointed out when she construed the relevant statutes, a biological parent may be a child's guardian, but a biological parent or guardian is not necessarily a child's custodial parent. Having also reviewed the appellate claims of both respondents, I would affirm the judgments of the trial court.

The respondent mother and the father filed separate appeals from the judgments of the trial court, terminating their parental rights as to their minor sons, Joseph, Jr., and Daniel. In AC 30476, the mother claims that the court's findings that (1) she had failed to achieve a sufficient degree of personal rehabilitation and (2) it is in the best interest of her sons to terminate her parental rights were clearly erroneous. In AC 30477, the father claims that the court (1) improperly concluded that he was not a custodial parent and was not entitled to contest the issue of neglect, (2) violated his constitutional rights and (3) made clearly erroneous findings that the department of children and families (department) had made reasonable efforts to reunite him with his sons and that he was unwilling or unable to benefit from such efforts. I disagree with all of the claims.

The following facts are relevant to the appeals. Joseph, Jr., was born in Scranton, Pennsylvania, on July 18, 2005. Commonwealth authorities took him into custody on July 21, 2005, prior to his discharge from

the hospital. Joseph, Jr., immediately was transferred to members of the department. The court, *Hon. Samuel S. Goldstein,* judge trial referee, approved orders of temporary custody on July 21, 2005.[1] The petitioner, the commissioner of children and families, filed a neglect petition as to Joseph, Jr., on July 21, 2005. The court, *C. Taylor, J.,* sustained the order of temporary custody and ordered specific steps for the respondents on August 5, 2005. Daniel was born in Waterbury on July 20, 2006. The department instituted a ninety-six hour administrative hold that day. See General Statutes § 17a-101g. On July 24, 2006, the court, *Trombley, J.,* granted an order of temporary custody as to Daniel[2] and ordered specific steps for the respondents on July 24, 2006. The petitioner filed a neglect petition as to Daniel on July 24, 2006. On August 2, 2007, the mother entered a plea of nolo contendere to the neglect petitions. Following a canvass, the court, *Wilson, J.,* adjudicated the children neglected, and they were committed to the custody of the petitioner.[3] On December 10, 2007, the petitioner filed petitions to terminate the respondents' parental rights as to their sons. Judge Olear granted the petitions and rendered judgments terminating the respondents' parental rights on October 1, 2008. The respondents timely filed separate appeals.

The court made the following relevant findings. The mother was forty-one years old at the time of the termination trial. She had completed high school and a medi-

---

[1] Judge Goldstein found that Joseph, Jr., was in "immediate physical danger from surroundings." See *In re T.K.,* 105 Conn. App. 502, 513, 939 A.2d 9 ("[t]he doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred"), cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

[2] Judge Trombley found that Daniel was in "immediate physical danger from surroundings." See *In re T.K.,* 105 Conn. App. 502, 513, 939 A.2d 9 ("[t]he doctrine of predictive neglect is grounded in the state's responsibility to avoid harm to the well-being of a child, not to repair it after a tragedy has occurred"), cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

[3] Additional facts related to the neglect proceedings will be set forth in part I of this dissenting opinion.

cal assistant program and had enrolled in some college level courses. Despite her intention to further her education, the mother's educational history is replete with unfinished classes and programs. Her employment history consists of various positions and demonstrates her inability to keep a job. When she was in high school, she was diagnosed with a brain tumor, which was surgically removed. The mother has had many and varied mental health and emotional issues, some of which may or may not have been occasioned by the trauma she suffered. At the time of the hearing on the termination petitions, the mother resided with her parents and worked part-time at a fast food restaurant.

The mother became involved with the department when her first child, a daughter, was born.[4] The daughter was removed from the mother's care within days of her birth due to concerns regarding the mother's mental health. She was adjudicated neglected on March 15, 2004, and the mother's parental rights as to her were terminated by the court, *Bear, J.*, on January 17, 2007.[5] During the pendency of the petition to terminate the

---

[4] The father in these cases is not the daughter's father.

[5] Judge Olear took judicial notice of the facts found by Judge Bear in terminating the mother's parental rights as to the daughter. See *In re Kristina H.*, Superior Court, judicial district of Middlesex, Child Protection Session at Middletown, Docket No. 2007724 (January 17, 2007). Judge Bear found, among other things, that the mother was always tired, was diagnosed as suffering from narcolepsy and characteristically does not take her medication. She has a self-reported history of self-defeating interpersonal difficulties and conflicts and a multiyear history of housing transience. After the daughter's birth, the mother had a psychotic reaction. The daughter was certified as being medically complex due to her premature birth, intrauterine growth retardation, placental insufficiency, low birth weight, slow weight gain and feeding adaptation. The mother opposed the specialized care the daughter received. The daughter's father told a department worker that he was somewhat concerned at the hospital because the mother persisted in claiming that their child was a boy, but he later felt assured that the mother posed no threat to the daughter. The mother was argumentative with the daughter's pediatrician and opposed medical advice to immunize her against certain diseases.

mother's parental rights as to the daughter, the mother denied to department personnel that she was pregnant with Joseph, Jr., despite her physical appearance to the contrary. The mother's criminal history is limited to an arrest that occurred while visiting the daughter in October, 2006.

The father, born in 1954, met the mother in 2001, when she was employed as a cashier at a convenience store. They maintained a relationship until the summer of 2007 when the mother pleaded nolo contendere to the neglect petitions at issue here. The respondents, however, have resumed their relationship. The father has a history of being guarded and imparts only limited information as to his past. During his initial meeting with department personnel on July 22, 2005, he refused to speak. He would not answer basic questions, including requests for his address and telephone number. Approximately three months later, he reluctantly provided department personnel with a minimal history. The court characterized his relationship with the department as hostile.

The father was graduated from high school at the age of twenty-three, after having served in the United States Navy. He has taken some college level courses and has been employed as a factory machine worker, construction worker and warehouseman. He suffered a spinal injury, however, and receives social security disability benefits. The father had worked as a stock clerk in a grocery store until he lost his job in December, 2006, and very recently was employed by McDonald's. The father, his mother and his grandmother live in separate areas of a house owned by his mother.

Joseph, Jr., was born in Pennsylvania because the respondents left Connecticut just before his birth in an effort to prevent department personnel from removing Joseph, Jr., from their care. Commonwealth authorities,

however, took temporary custody of Joseph, Jr., due to the mother's bizarre behavior and the inconsistent and inaccurate statements made by both respondents. After his custody was transferred to the petitioner, Joseph, Jr., was placed in a foster home where he stayed until September 14, 2005, when he moved to his current foster home, where he resides with his younger brother, Daniel, and his half sister.[6] Joseph, Jr.'s physical development is age appropriate, but he has exhibited behavioral issues, including aggression toward other children, adults and animals. He also smears feces. According to Joseph, Jr.'s foster mother, Joseph, Jr.'s behavior deteriorated when the length of the visits with his father were extended to six hours per visit. His behavior improved when the length of such visits was shortened. Joseph, Jr., and his foster mother have been receiving services to address his behavioral issues, and Joseph, Jr., is responding favorably.

Daniel, the respondents' second child, was placed in a foster home on July 23, 2006, where he currently resides with Joseph, Jr., and his half sister. Daniel's development is age appropriate, and he has no reported behavioral issues. The foster family wants to adopt Joseph, Jr., and Daniel. Additional facts will be set forth as needed.

I

NEGLECT PETITIONS AS TO THE FATHER

The father claims that the court erred by concluding that he was not a custodial parent and, therefore, not entitled to contest the neglect petitions, which he also claims violated his rights to due process and equal protection of the law. I disagree.

A

The majority opinion contains a lengthy procedural history concerning the adjudications of neglect. I agree

---

[6] The foster family had adopted the daughter.

with that recitation of the procedural history, and I agree with the majority that if the father were a custodial parent, he would be entitled to oppose the neglect petitions. See *In re David L.*, 54 Conn. App. 185, 193, 733 A.2d 897 (1999). I also agree with the majority that whether a parent is a custodial parent is a question of law to which the plenary standard of review applies. See *In re William D.*, 97 Conn. App. 600, 606, 905 A.2d 696 (2006), aff'd, 284 Conn. 305, 933 A.2d 1147 (2007). I disagree with the majority, however, that the court's conclusion that the father was not a custodial parent is erroneous.

Pursuant to plenary review, "[t]he underlying historical facts found by the . . . court may not be disturbed unless the findings were clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators." (Internal quotation marks omitted.) *Correia* v. *Rowland*, 263 Conn. 453, 462, 820 A.2d 1009 (2003). "Under plenary review, we must decide whether the trial court's conclusions of law are legally and logically correct and find support in the record." (Internal quotation marks omitted.) *Joyner* v. *Simkins Industries, Inc.*, 111 Conn. App. 93, 97, 957 A.2d 882 (2008).

Pursuant to Judge Bear's order, the father was given an opportunity at the beginning of the termination trial on September 4, 2008, to demonstrate that he was a custodial parent of Joseph, Jr., and Daniel. Judge Olear concluded that the father failed to establish by a preponderance of the evidence that he was a custodial parent. In an articulation, the court made the following findings of fact relevant to whether the father was a custodial parent. The court found that the father was present at the birth of both Joseph, Jr., and Daniel, governmental authorities removed both children from the hospitals where they were born prior to the hospitals' discharging them and the father acknowledged his paternity of

Joseph, Jr., and Daniel. Moreover, prior to the court-ordered temporary custody of the children that was granted to the petitioner, no court had established a legal custodian for either child.

The court also found that the father offered a paucity of evidence to prove that he was a custodial parent or potentially was a custodial parent. He failed to introduce evidence to refute the mother's acknowledgment, by entering a plea of nolo contendere, that she was a custodial parent. The father also failed to demonstrate that he was, or intended to be in the foreseeable future, a de facto custodial parent to Joseph, Jr., and Daniel. He offered no evidence that the respondents were married to one another, that they resided together or that they intended to reside with the children in the same home upon discharge from the hospitals. There was no evidence that the father was going to or had prepared to care for the children in his residence at the time the neglect petitions were filed or at any foreseeable time in lieu of or in addition to the children's being cared for by the mother in her separate residence.[7] The father established that he was a guardian of the children but not a custodian who was ready, willing and able to provide for the physical care and immediate day-to-day supervision of the children. Neither the father nor the majority take issue with those findings.[8] I conclude, therefore, that the court's findings are supported by the record and are not clearly erroneous.

In making its findings, the court noted that "[i]t is the right and the duty of the [trier of fact] to draw

[7] In making findings during the dispositional phase of the trial, the court found that the father did not provide personnel at the hospital where Joseph, Jr., was born with an address that could be confirmed as his residence. The father did not provide department personnel with his address until October, 2006.

[8] I agree with the majority that the father did not stand silent at the neglect hearing, and the court's finding in that regard is clearly erroneous.

reasonable and logical inferences from the evidence. . . . In considering the evidence introduced in a case, [triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life, but, on the contrary, to apply them to the facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *In re Carissa K.*, 55 Conn. App. 768, 783, 740 A.2d 896 (1999). The record supports the court's finding that the father had failed to demonstrate that he was in any way prepared to provide for the physical care, safety and support of either Joseph, Jr., or Daniel.

I further conclude that the court properly applied the applicable section of the rules of practice and our General Statutes to the issue before it. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 552, 979 A.2d 469 (2009). "The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 847, 937 A.2d 39 (2008). "It is a basic tenet of statutory construction that the legislature does not intend to enact meaningless provisions. . . . Every word and phrase [in a statute] is presumed to have meaning, and

we do not construe statutes so as to render certain words and phrases surplusage." (Citation omitted; internal quotation marks omitted.) *Remax Right Choice* v. *Aryeh*, 100 Conn. App. 373, 382, 918 A.2d 976 (2007). "A statute should be construed so that no word or phrase or clause will be rendered meaningless. . . . [W]e must consider the statutory scheme as a whole, giving meaning to every section, and assuming no word or phrase to be superfluous." (Citation omitted; internal quotation marks omitted.) *Savage* v. *Aronson*, 214 Conn. 256, 289, 571 A.2d 696 (1990) (*Glass, J.,* dissenting).[9]

In 2007, Practice Book § 35a-1 provided in relevant part: "(b) Notwithstanding any prior statements acknowledging responsibility, the judicial authority shall inquire whether the allegations of the petition are presently admitted or denied. This inquiry shall be made of the *custodial* parent in neglect, uncared for or dependent matters; and of all appearing parents in termination matters." (Emphasis added.) Reading Practice Book (2007) § 35a-1 (b) together as a cohesive whole and applying the plain meaning to its words demonstrate that the rule contemplated at least two types of parents, a custodial parent and all appearing parents. Parent is a noun modified by either the adjectives custodial or all appearing. Moreover, the word guardian does not appear in Practice Book (2007) § 35a-1 (b).

The court correctly noted that neither our rules of practice nor General Statutes § 46b-129 define the term custody or custodial parent but that our rules of practice and our statutes differentiate between the terms guardian and custody. Part II of chapter 802h in title 45a of our General Statutes is entitled "Guardians of the Person

---

[9] I agree with the majority that the construction of our rules of practice is a question of law and that the principles governing the construction of statutes applies. See *Malave* v. *Ortiz*, 114 Conn. App. 414, 417, 970 A.2d 743 (2009).

of a Minor." General Statutes § 45a-604 provides the applicable definitions used in General Statutes §§ 45a-603 to 45a-622. Section 45a-604 provides in relevant part: "(1) 'Mother' means a woman who can show proof by means of a birth certificate or other sufficient evidence of having given birth to a child . . . (2) 'Father' means a man who is a father under the law of this state including a man who, in accordance with section 46b-172, executes a binding acknowledgment of· paternity . . . (3) 'Parent' means a mother as defined in subdivision (1) of this section or a 'father' as defined in subdivision (2) . . . (5) 'Guardianship' means guardianship of the person of a minor, and includes: (A) The obligation of care and control; (B) the authority to make major decisions affecting the minor's education and welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment; and (C) upon the death of a minor, the authority to make decisions concerning funeral arrangements and the disposition of the body of the minor . . . (6) 'Guardian' means one who has the authority and obligations of 'guardianship' as defined in subdivision (5) of this section . . . ." The word custody is not defined.

General Statutes § 45a-606 provides: "The father and mother of every minor child are joint guardians of the person of the minor, and the powers, rights and duties of the father and the mother in regard to the minor shall be equal. If either father or mother dies or is removed as guardian, the other parent of the minor shall become the sole guardian of the person of the minor." Although the statute establishes that both parents are guardians of their child, it does not say that both parents are a custodial parent. General Statutes § 45a-607 (b), which provides in relevant part that "[i]n the case of a minor child in the custody of the parent or other guardian, *no application for custody of such*

minor child may be granted ex parte," further demonstrates that being a parent does not mean that the parent is a custodial parent.

In its articulation, the court construed § 46b-129 (j), which provides, in relevant part, that on commitment of a child to the petitioner, "the court may vest such child's . . . care and personal custody in any private or public agency . . . . The commissioner shall be the guardian of such child . . . ." Section 46b-129 (j) further permits the court after adjudicating a child neglected, as an alternative to commitment, to "place the child . . . in the custody of the *parent* or *guardian* with protective supervision . . . ." (Emphasis added.) The court noted that the statutes and rules of practice differentiate between the terms custody and guardian, and that each word has a separate and distinct meaning. For example, § 45a-607 (b) provides that a child may be in the "custody of a person other than the parent or guardian . . . ."

The court further reasoned that, in the absence of a court order, parents are only the legal guardians of a minor child. As guardians, parents have the obligation of care and control of their child. See General Statutes § 45a-604. The court continued, stating that the custodian of a minor child, absent a clearly defined court order, means the parent or person with whom a minor child resides, at all times or from time to time, and who assumes the responsibility for all or part of the day-to-day care and supervision of the child. While a parent is a guardian of a minor child, absent a court order to the contrary, a parent is not necessarily a custodial parent absent a court order (legal custody) or evidence that the child resides with such parent and such parent is providing day-to-day care and supervision (de facto custody).

I have reviewed the father's testimony offered to prove that he was a custodial parent of Joseph, Jr., and

Daniel.[10] In essence, the father relies on the fact that he is the children's biological father and that he was present at the time of their births to prove by a preponderance of the evidence that he was their custodial parent. The mother and father are not, and never have been, married to one another. The father did not present evidence that he resided with the mother or what efforts or steps he had taken prior to the births of Joseph, Jr., and Daniel, or planned to take immediately thereafter, that would lead a reasonable person to conclude that he had assumed the obligation of a guardian to provide care and control; see General Statutes § 45a-604 (5); or the duties of a guardian. See General Statutes § 45a-606. At the very least, to prove that he was a custodial parent, the father had to present evidence of where he lived, that he intended for Joseph, Jr., and Daniel to live there with him and what preparations he had made to provide for them. Evidence to prove that one is the custodial parent of a newborn *might include* the place where the custodial parent and child will reside upon the child's discharge from the hospital, the purchase of a child safety seat necessary to transport the child from the hospital, the name of a pediatrician or clinic where the child will be taken for developmental checkups, immunizations and medical care, the inclusion of the child under the parent's health insurance plan and the purchase of clothing, a crib and other necessaries, to name a few.[11]

---

[10] Other than his own testimony, the father offered no other evidence to prove that he was a custodial parent.

[11] The case law on which the majority relies for the proposition that a parent is a custodial parent—*Doe* v. *Doe*, 244 Conn. 403, 476, 710 A.2d 1297 (1998) (*Katz, J.*, concurring in part and dissenting in part); *Boardman* v. *Boardman*, 135 Conn. 124, 129, 62 A.2d 521 (1948); *Dunham* v. *Dunham*, 97 Conn. 440, 442, 117 A. 504 (1922), overruled in part on other grounds by *Freund* v. *Burns*, 131 Conn. 380, 385, 40 A.2d 754 (1944)—are dissolution actions in which the parents litigated as to who should have custody of their minor child. In dissolution actions involving minor children, trial courts of this state repeatedly are called on to award custody of the children to one or both biological parents who are their guardians. The cases relied on

B

The father also claims that the court's finding that he was not a custodial parent deprived him of a trial with respect to the neglect petitions and violated his rights to due process and equal protection. The father failed to raise those claims at trial and seeks to reverse the termination of his parental rights pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The father cannot prevail under *Golding*, as he is attempting to bootstrap his claim of an erroneous factual finding into a claim of constitutional dimension.[12] Practice Book (2007) § 35a-1 (b) provides in relevant part that "[n]otwithstanding any prior statements acknowledging responsibility, the judicial authority shall inquire whether the allegations of the petition are presently admitted or denied. This inquiry shall be made of the *custodial parent* . . . ." The court found that the father was not a custodial parent, and he has not demonstrated on appeal that the finding was clearly

by the majority do not support its proposition that because a child's biological parent is the child's guardian that parent is a custodial parent.

The majority also cites the testimony of Kathleen Dayner, a department social worker, that the department considered the father to be a custodial parent. Dayner's testimony is nothing more than that. Whether a parent is a custodial parent, as the majority points out, is a question of law for the court to determine.

At footnote 29 of its opinion, the majority states that there was no evidence that the mother presented evidence that she was a custodial parent. That assertion is irrelevant to the claim raised by the father in his appeal. If the mother had contested the neglect petitions, she may have been required to prove that she was a custodial parent, but the fact of the matter is that she pleaded nolo contendere. The rights of the mother and the father are separate. Judge Bear acknowledged that the father had the right to contest the neglect petitions if he were a custodial parent of the children. Judge Bear gave the father the opportunity to demonstrate that he was a custodial parent. Judge Olear, however, found that the father was not a custodial parent, and, therefore, he was not permitted to contest the neglect petitions.

[12] Significantly, the father claims that the court's finding, not the dictates of the rules of practice, violated his rights to due process and equal protection.

erroneous or that the finding is of constitutional magnitude. The claim, therefore, is not entitled to *Golding* review.

For all of the foregoing reasons, I conclude that the court properly determined that the father was not a custodial parent of Joseph, Jr., and Daniel.

## II

## TERMINATION OF PARENTAL RIGHTS

The respondents have appealed from the termination of their parental rights as to Joseph, Jr., and Daniel. Before addressing their respective claims, I set forth the guiding principles and standard of review applicable to appeals from the termination of parental rights.

"The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care . . . ." General Statutes § 17a-101 (a). "Time is of the essence in child custody cases. . . . This furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment." (Citation omitted; internal quotation marks omitted.) *In re Juvenile Appeal* (*Docket No. 10155*), 187 Conn. 431, 439–40, 446 A.2d 808 (1982).

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . . On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported." (Internal quotation marks omitted.) *In re*

*Cheila R.*, 112 Conn. App. 582, 589, 963 A.2d 1014 (2009). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jorden R.*, supra, 293 Conn. 558–59.

"The legal framework for deciding termination petitions is well established. [A] hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in [General Statutes] § 17a-112 . . . exists by clear and convincing evidence. . . . If the trial court determines that a statutory ground for termination exists, then it proceeds to the dispositional phase. During the dispositional phase, the trial court must determine whether termination is in the best interests of the child. . . . The best interest determination also must be supported by clear and convincing evidence." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 487–88, 940 A.2d 733 (2008).

The petitioner filed petitions to terminate the parental rights of the respondents as to Joseph, Jr., and Daniel on December 10, 2007.[13] She alleged that the department had made reasonable efforts to reunify the respondents with the children and that the respondents were unable

---

[13] The earlier procedural history is set out in full in the majority opinion.

or unwilling to benefit from reunification efforts. As the basis for the termination of parental rights, the petitioner alleged that the children "[had] been found in a prior proceeding to have been neglected . . . and [the respondents] have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the [children], they could assume a responsible position in the life of the [children]." See General Statutes § 17a-112 (j) (3) (B) (i). The petitioner also alleged that the mother has children "under the age of seven years who [are] neglected . . . [and] has . . . failed, is . . . unable or is . . . unwilling to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the age and needs of the [children], such parent could assume a responsible position in the life of the [children] and such parent's . . . parental rights of another child were previously terminated pursuant to a petition filed by the [petitioner]." See General Statutes § 17a-112 (j) (3) (E).

"[T]o terminate parental rights under § 17a-112 (j), the [petitioner] is required to prove, by clear and convincing evidence, that [the department] has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification . . . ." (Internal quotation marks omitted.) *In re Christopher B.*, 117 Conn. App. 773, 779–80, 980 A.2d 961 (2009). Here, the court found that neither respondent, despite having been offered numerous services, was willing or able to benefit from them.

"If the court finds that the petitioner has proven by clear and convincing evidence that one of the statutory grounds for termination of parental rights exists, it must then determine whether termination is in the best interests of the child. . . . The best interests of the child

include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]." (Citations omitted; internal quotation marks omitted.) *In re Anthony H.*, 104 Conn. App. 744, 763–64, 936 A.2d 638 (2007), cert. denied, 285 Conn. 920, 943 A.2d 1100 (2008). After the court found during the adjudication stage of the proceedings that neither of the respondents had achieved a sufficient degree of personal rehabilitation, the court made the necessary findings during the dispositional stage.

The court found by clear and convincing evidence that department personnel offered the respondents many services to address the issues each of them had and to reunify the family. The court also found that department personnel had offered services to the children. Neither of the respondents attained the benefit from the services offered necessary to nurture and to parent the children appropriately or to be a resource for them. Moreover, the court found that department personnel made reasonable efforts to reunite the family in accordance with the federal Adoption Assistance and Child Welfare Act of 1980, as amended. See generally 42 U.S.C. § 670 et seq.

The court found that specific steps were ordered for the respondents but that the respondents were noncompliant with the majority of the significant steps. In particular, the respondents were noncompliant with the steps requiring that they make progress toward specific and identified goals. The respondents were compliant

with steps of somewhat lesser import in the termination proceedings. The court concluded that the department had fulfilled its obligation to facilitate reunification of the family.

As to the feelings and emotional ties the children have with respect to the respondents, guardians of the person and any person who has exercised physical care, custody or control of the children for at least one year and with whom they have developed significant emotional ties, the court found that Joseph, Jr., and Daniel have some positive feelings and emotional ties to the respondents. Joseph, Jr., and Daniel have a strong bond with one another, with their half sister, and with the foster family with whom they have lived since September 14, 2005, and July 23, 2006, respectively. The children have adjusted well to their placements, although Joseph, Jr., has demonstrated some behavioral issues, which are being addressed by the foster mother. The foster mother provides the day-to-day physical, emotional, moral and educational support the children need, is committed to them and would like to adopt them.

The court found that department personnel investigated relatives of the respondents as placement resources. The mother offered her parents as a potential resource for Joseph, Jr., and Daniel. In March, 2004, with respect to a placement for their half sister, however, department personnel determined that the mother's parents were not suitable. Consequently, department personnel did not consider the children's maternal grandparents as a suitable resource for them. The father did not offer any family member as a placement for his sons.

The court found that at the time of the termination trial, Joseph, Jr., was three years and three months old, and Daniel was approximately two years and three

months old. It also found that the respondents maintained contact with the children on a consistent basis but that they were openly defiant regarding their need to engage in services offered to strengthen their abilities to care for their sons. They failed to engage in services in a timely manner and to make any meaningful progress regarding their abilities to achieve identified goals. Moreover, the court found that the respondents had failed to follow treatment recommendations and, over the course of this case, denied any personal responsibility for the cause of the children's removal from their care. The court concluded, citing *In re Luis C.*, 210 Conn. 157, 167, 554 A.2d 722 (1989), that giving the respondents additional time to achieve personal rehabilitation was not likely to enable either one of them to modify his or her condition to make it in the best interests of the children to be reunited with them.

As to whether the respondents were prevented from maintaining a meaningful relationship with the children, the court found that no unreasonable conduct by the department, foster parents or third parties prevented the respondents from having a meaningful relationship with Joseph, Jr., and Daniel. Although the respondents' financial circumstances are limited, economic factors did not prevent the respondents from achieving rehabilitation.

In addition to considering the evidence presented, the court also considered the totality of the circumstances surrounding Joseph, Jr., and Daniel, including their interest in sustained growth, development, well-being, stability, continuity of their environment, their length of stay in foster care, the nature of their relationship with the respondents and their foster parents and the degree of contact they have had with the respondents. See *In re Alexander C.*, 60 Conn. App. 555, 559, 760 A.2d 532 (2000). The court also noted that this court has stated that "[b]ecause of the psychological effects

of prolonged termination proceedings on . . . children, time is of the essence . . . ." *In re Alexander V.*, 25 Conn. App. 741, 748, 596 A.2d 934 (1991), aff'd, 223 Conn. 557, 613 A.2d 780 (1992). The court stated that it had balanced the children's need for stability and permanency against the benefits of maintaining a connection to the respondents. See *Pamela B. v. Ment*, 244 Conn. 296, 314, 709 A.2d 1089 (1998). The court found that Joseph, Jr., and Daniel require the stability of placement and continuity of care. The court, therefore, found by clear and convincing evidence that termination of the respondents' parental rights was in the best interests of Joseph, Jr., and Daniel.

## A

## AC 30476

On appeal, the respondent mother claims that the court's findings that (1) she had failed to achieve a sufficient degree of personal rehabilitation, (2) her parental rights should be terminated pursuant to § 17a-112 (j) (3) (E), and (3) it was in the best interests of Joseph, Jr., and Daniel to terminate her rights were clearly erroneous. I disagree.

## 1

The mother's first claim is that the court's finding that she had failed to achieve a sufficient degree of personal rehabilitation is clearly erroneous. The essence of her claim is that, although she has mental health issues, the court erred in finding that she could not achieve a sufficient degree of personal rehabilitation within a reasonable time, as rehabilitation does not require that she be able to assume full responsibility for her children without ongoing support services. Under the circumstances of this case, I do not agree.

The following facts are relevant to the resolution of the mother's claim. The court found by clear and

convincing evidence that department personnel had made reasonable efforts to reunify the mother with her children. The department personnel repeatedly referred the mother to many service providers, including: Connecticut Resource Group; Heather Toll, a psychologist, for individual counseling services; Family Intervention Center for individual counseling services and medication management; Anthony F. Campagna, a psychologist, for individual counseling services; Brett A. Steinberg, a clinical psychologist, for individual counseling services; Northwest Center for Family Service and Mental Health-Parent Aid services; and McCall Foundation, Parent Education and Assessment Services. The court found that the mother repeatedly failed, by her own volition, to engage in and to take advantage of services offered by the department. Department personnel made reasonable efforts to reunify the mother with Joseph, Jr., and Daniel. The fact that those efforts did not result in reunification, the court concluded, is due to the mother's decisions, actions and omissions. The court also found that the mother is unwilling or unable to benefit from reunification efforts.

The court also found that the mother failed to achieve a sufficient degree of personal rehabilitation within the meaning of § 17a-112 (j) (3) (B) (i). "Personal rehabilitation as used in [§ 17a-112] refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . [The statute] requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Citations omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674,

706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999). "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) *In re Amneris P.*, 66 Conn. App. 377, 384, 784 A.2d 457 (2001). "Terminating a parent's rights is not ordered to punish a parent who has not tried to rehabilitate; it is ordered so as not to punish a child by denying [the child] a safe permanent home with proven competent caretakers because [the] biological mother has tried hard but continues to be incapable of providing such a home for [the child]." *In re Samantha B.*, 45 Conn. Sup. 468, 477, 722 A.2d 300 (1997), aff'd, 51 Conn. App. 376, 721 A.2d 1255 (1998), cert. denied, 248 Conn. 902, 732 A.2d 177 (1999).

In assessing a parent's rehabilitative progress, the question is not simply how far the parent has come, but whether the parent has come far enough to encourage the belief that within a reasonable period of time, the parent can assume the role of parent in the life of the child. *In re Stanley D.*, 61 Conn. App. 224, 230, 763 A.2d 83 (2000). "What constitutes a reasonable [period of] time is a factual determination that must be made on a case-by-case basis." Id., 231. The court is to consider whether the degree of rehabilitation is sufficient to foresee that the parent may assume, within a reasonable time, a useful role in the child's life, and the court may rely on events occurring after the filing of the petition to terminate parental rights. Id., 230. The court also may inquire into the full history of the respondent's parenting abilities. *In re Galen F.*, 54 Conn. App. 590, 594, 737 A.2d 499 (1999). See footnote 5 of this dissenting opinion.

The court found by clear and convincing evidence that the mother had failed to achieve such a degree of

personal rehabilitation as to encourage a belief that within a reasonable period of time, she could assume her role as a parent for Joseph, Jr., and Daniel. At the time of the neglect adjudications, the mother's problems had arisen from her failure to address her mental health issues and her lack of parenting and life skills. The mother was not fully compliant with the specific steps requiring her to participate in counseling and to follow the recommendations of the court-ordered evaluations, among others. The mother generally complied with several steps, including visiting the children when permitted. The other steps with which she complied, however, were rendered inconsequential due to her failure to engage in and benefit from services, therapies and programs made available to her. The mother has a consistent pattern of failing to follow recommendations from court evaluators to address her psychiatric problems, and mental health and emotional concerns. She failed to obtain and to follow up with appropriate medication management. Her efforts to self-regulate her narcolepsy have not been successful. The court itself observed the mother having difficulty remaining awake and focused during court proceedings.

Moreover, the court found that the mother also failed to demonstrate that she has improved her ability to parent safely and to care for her children despite having attended parenting classes and Parent Education and Assessment Services through the McCall Foundation. Her lack of progress was demonstrated by her failing to supervise her children adequately, including an incident at a mall when Joseph, Jr., bolted from her and she left one year old Daniel with a stranger while she pursued Joseph, Jr. The mother has failed to learn and to employ safe, responsible and appropriate child care methods. She also has not demonstrated an ability to maintain gainful employment or to live independently.

According to mental health professionals, months of personal therapy and professional help will be required to help the mother to deal with her psychological problems. In August, 2007, Steinberg, a psychologist the mother had met with on multiple occasions, opined that "[d]ue to chronicity, severity, and pervasiveness of symptoms, treatment expected to be a gradual and long-term process that could [take] as long as several years. Under ideal circumstances, i.e., active and sustained engagement in therapy with full utilization of coaching resources, prognosis would be guarded. If [the mother] failed to develop greater self-awareness and remained other-focused and skeptical about treatment, prognosis would be poor." In November, 2007, Steinberg terminated psychotherapy with the mother due to the mother's failure to participate actively in treatment and to attend appointments. The court ultimately concluded that it could not make decisions as to the children's future predicated on the hope of parental rehabilitation but had to base its decisions on whether the mother had successfully completed counseling and parent training or had demonstrated parental competence.

The mother claims that she successfully has stabilized her situation, albeit in a limited fashion. She claims that department personnel failed to devise a treatment plan specific to her needs. Although she makes that claim, the mother has not identified how the services and treatment plans she was offered were inappropriate or inadequate. The evidence indicates that the mother failed to make progress because she did not commit herself to the treatment plans or apply herself to the services offered. For example, the mother suffers from narcolepsy. She was provided medical evaluations and treatment. She failed to comply with the treatment program because she declines to take the medication necessary to stabilize her condition.

The mother also claims that she has achieved a level of rehabilitation whereby she could take care of her children, if the department provided her with support services. She compares her situation favorably with the facts of *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). The facts of that case are distinguishable from the facts here. In *In re Juvenile Appeal (84-3)*, the court stated that "[t]he respondent is enrolled in the [Child and Family Services] parenting program, which provides her with a parent aide at her home once per week, who teaches her budgeting, planning and preparing meals, role modeling and the wise use of time. The respondent is receptive to this program, has impressed everyone with her ability to follow through on goals, is motivated and recognizes this as part of her goals both of caring for her second child and having her first child with her." Id., 473. Those facts, unfortunately, do not describe the mother's ability to benefit from services in this case.

On the basis of my review of the record, I conclude that the court's finding that the mother had failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable period of time, considering the ages and needs of Joseph, Jr., and Daniel, she could assume a responsible position in their lives is not clearly erroneous. The court's findings reflect that the mother is not able to take care of herself, let alone the needs of two small children, including one with behavioral issues. Because there was sufficient evidence that Joseph, Jr., and Daniel could not be returned safely to their mother's care, further services were not required. See *In re Juvenile Appeal (84-AB)*, 192 Conn. 254, 258, 471 A.2d 1380 (1984).

2

The mother's second claim is that the court's finding that her parental rights should be terminated pursuant

to § 17a-112 (j) (3) (E) is clearly erroneous. I do not agree.

As the court stated in its memorandum of decision, the petitioner alleged that the mother has failed to achieve sufficient personal rehabilitation after Joseph, Jr., and Daniel previously had been adjudicated neglected and her parental rights as to another child were terminated previously. The court found that Joseph, Jr., and Daniel were adjudged neglected on August 2, 2007, and that each of them is younger than seven years of age. The court also found that the mother's parental rights as to her daughter were terminated on January 17, 2007. In determining whether the mother had achieved a degree of personal rehabilitation sufficient to encourage a belief that she could assume a responsible position in the life of her children, the court adopted the definitions, meanings and findings set forth in part II A 1 of this dissenting opinion. The court found the credible evidence presented through the testimony and exhibits clearly and convincingly established that the mother had not achieved the degree of rehabilitation that would encourage the belief that she could, within a reasonable time, assume a responsible position in the lives of Joseph, Jr., and Daniel.

Again, the mother's claim is that the court's finding that she had failed to achieve a sufficient degree of personal rehabilitation is clearly erroneous. For the same reasons stated in part II A 2 of this dissenting opinion, I cannot conclude that the court's finding is clearly erroneous.

3

The mother's third claim is that the court's finding that it is in the best interests of Joseph, Jr., and Daniel to terminate her parental rights is clearly erroneous. The claim is unavailing.

The facts concerning the dispositional phase of the termination of parental rights petition as to the mother were set out in part II of this dissenting opinion. In her brief on appeal, the mother as much as concedes that she is not able to care for Joseph, Jr., and Daniel independently and would rely on the father to provide the necessary care for their sons. The father's parental rights, however, have been terminated as to Joseph, Jr., and Daniel.

The mother argues that because her interaction with her sons has been loving, it is in the children's best interests not to terminate her parental rights. She suggests that the children continue to be cared for by their foster family but that she be permitted to maintain a relationship with them. She relies on part of a sentence from *In re Sheena I.*, 63 Conn. App. 713, 726, 778 A.2d 997 (2001), for the proposition that "there are cases where a court may deem it appropriate for a child to maintain contact with his or her biological parent . . . ." This court concluded that sentence with the words, "the court did not so find in this case." Id. So, too, in this case, the court did not find that it was in the best interests of Joseph, Jr., and Daniel for the mother to maintain contact with them. The court balanced "the children's intrinsic need for stability and permanency against the benefits of maintaining a connection with their biological parents" and found that "these children require the stability of placement and continuity of care." The record supports the court's finding that termination of the mother's parental rights is in the best interests of Joseph, Jr., and Daniel.

B

AC 30477

With respect to the termination of his parental rights, the father claims that the court's findings that the department made reasonable efforts to reunify him with

his children and that he was unwilling or unable to benefit from such efforts are clearly erroneous. I disagree.

The court made the following findings of fact with regard to the father. The court-ordered steps required the father to keep all appointments set by or with the department, and to cooperate with department home visits, both announced and unannounced, and to cooperate with visits from the children's court-appointed attorney or guardian ad litem. From July 20, 2005, to October 16, 2006, the father refused to grant department and service providers access to the apartment in which he resided. He granted access to his mother's apartment only. He consistently refused to grant access to his home to Maria Coutant-Skinner, a parent educator with McCall Foundation's Parent Education and Assessment Services program. He therefore failed to demonstrate to service providers that his residence would provide a safe and nurturing environment for his children.

On January 8, 2007, the father was not present for a scheduled visit with his children, as he chose to attend the trial of the petition to terminate the mother's parental rights as to her daughter. On August 3, 2007, during a visit scheduled by the mother to be held in the father's home, the father ordered the mother and a department social worker off his property.

The father was to keep his whereabouts known to the department, his attorney and the attorney for his children. At the time of Joseph, Jr.'s birth, the father provided the hospital in Scranton with an address in Waterbury, but department personnel were never able to verify that the father ever resided at that address. It was not until October, 2006, that the father provided department personnel with an address, which was not in Waterbury. Since that time, the father has complied with this step.

The father was to participate in parenting and individual counseling and to make progress toward identified goals, specifically, to learn safe, responsible and appropriate child care, and to make progress toward other goals to be determined by department personnel and service providers. The court found that he had not complied with that step. Between July, 2005, and November, 2006, the father was provided with a copy of his individual steps and referred to several agencies for individual counseling. Department personnel sent the father letters, stating that he needed to engage in individual counseling, and including offers of assistance in fulfilling the court-ordered steps. In February, 2006, during a court-ordered evaluation, the father stated to Stephen M. Humphrey, a psychologist, that the only service he had been ordered to engage in was parenting education classes. The father attended parenting classes, as evidenced by a certificate of perfect attendance in Family Ties Parenting with Care Class.

On November 11, 2006, Warren Corson III, a psychologist, initiated services with the father. To assess the father's needs, Corson met with the father four times. Corson recommended that the father could benefit from individual and family therapy to help him address his issues relating to the department's involvement in his life and related adjustment issues. Corson further diagnosed the father with an axis II personality disorder not otherwise specified, but the father continued to state that he did not feel the need for counseling and scheduled no further appointments with Corson until February, 2007. In October, 2007, Corson discharged the father from services due to the father's failure to maintain regularly scheduled appointments. The father maintained that his lack of transportation prevented him from attending his appointments. On October 30, 2007, Corson agreed to provide services for the father again under specific conditions made known to the

father. The department provided transportation so that the father could attend appointments with Corson. On November 13, 2007, the father met with Corson and told the psychologist, among other things, that he did not want to attend counseling. Corson, therefore, discharged the father from therapy.

On November 21, 2006, the father participated in an initial home visit with the Northwest Center for Family Services and Mental Health parent aide program (parent aide program). He was unreceptive and distracted during a home visit in December, 2006. He articulated annoyance at having to answer hypothetical parenting questions and requested that the meeting be held at a time different from when he was visiting with his children. To address the father's concerns, the parent aide program modified its involvement to include one scheduled visit with and one without the children. Parent aide service providers advised department personnel that the father had a difficult time setting goals and developing a treatment plan for himself because he did not believe that he needed help to be a parent to his children. He believed that he possessed strong and appropriate parenting skills. The only reason he was engaging in services, he stated, was the advice of his attorney. Service providers for the parent aide program reported to department personnel on February 12, 2007, that they were closing the father's case, as they believed that the program was ineffective for him.

Another step the father was to follow was to cooperate with in-home support services referred by department personnel. In August, 2006, the father began a one year parent education program offered by the McCall Foundation's Parent Education and Assessment Services program. Coutant-Skinner, the program worker, reported that the father generally engaged his children appropriately during the visits she observed, but his parenting deficits arose due to his lack of cooperation

with the program and resistance to its outlined goals. The father denied Coutant-Skinner access to his apartment. She, therefore, could not measure his progress, if any, in creating a home for his children. He failed to keep scheduled appointments and to make future appointments regularly. At the end of the initial twelve month program, the father had made minimal progress toward achieving goals, but his participation in the program was extended to help him meet those goals. His participation in the program, however, was discontinued due to his failure to make adequate gains toward the goals.

The department engaged Delta-T Group to provide supervision and parenting instruction for the father during parent-child visits in December, 2006. The father initially was cooperative but over time demonstrated oppositional and passive aggressive behaviors when offered suggestions on how to better meet his children's needs during visits. He provided care for his children during his twice weekly supervised visits, but at times, he failed to address his children's needs. For example, he resisted disciplining Joseph, Jr., and failed to provide adequate parental interventions when needed, failed to recognize the need to get his children out of the hot sun, allowed them to wander too close to a busy traffic area and resisted having Joseph, Jr., sit in a high chair to be fed although it was developmentally appropriate. The father repeatedly was oppositional when asked to provide the children with a nap and a routine during visits.

The father substantially failed to comply with service providers for parenting, individual and family counseling, in-home support services and substance abuse assessment and treatment, as determined by department personnel. Members of the department referred the father to The Family Intervention Center, Charlotte Hungerford Behavioral Health Center, the Family

Strides, Inc., program and Family Services of Greater Waterbury, Inc., but the father did not involve himself with any of those agencies. He attended an initial appointment at the Family Intervention Center in October, 2005, but refused to fill out basic paperwork, and the agency could not proceed. When he was told that he could not be seen unless he completed the necessary paperwork, the father stated that he did not want to be there, did not need to be there and found the questions offensive. He did not return to the Family Intervention Center.

The court found that the father failed to cooperate with court-ordered evaluations or testing and follow-up recommendations. He met with Humphrey on February 3, 2006, for an evaluation, but the evaluation was delayed as the father would not speak with Humphrey until the father's attorney was present. The father had not advised Humphrey or department personnel of his desire to have an attorney present until the start of the appointment. The father's attorney was contacted and arrived one hour into the appointment. During the evaluation, Humphrey administered the personality assessment inventory to the father to provide information on critical client variables that he deemed central to devising a treatment plan, implementing it and evaluating a client. Humphrey found the father's profile to be "entirely invalid," construing the father's score as the father's attempt to present himself as a person "extraordinarily free of common faults." Humphrey made several specific recommendations regarding the steps he wanted the father to take toward a reunification plan. Humphrey's recommendations included the father's informing department personnel of his specific child care plan, including alternate caregivers and permitting department personnel into his home to determine its suitability for the children's care. In keeping with the recommendations, department personnel sent the

father two written requests, on April 21 and June 9, 2006, requesting his plan. The father did not provide his child care plan until approximately eight months after Humphrey made the recommendation, and the father never provided access to his home to allow for a determination of its suitability for the children's care.

On September 26, 2006, Humphrey conducted a second court-ordered psychological evaluation of the respondents. Humphrey recommended that the respondents together consult with a psychotherapist experienced in treating individuals with a history of neuropsychological deficits. According to Humphrey, this type of consultation would instruct the respondents as to the nature of the mother's condition, assess their understanding and integration of the information, and, if successful to that point, help them develop strategies and coping mechanisms that would minimize interpersonal conflict and provide for effective supervision of the children. Humphrey recommended that the respondents engage in a clinical environment designed to assist both of them in better understanding the mother's mental health and medical issues. Humphrey also recommended that the father continue to engage in parenting assessment services. The father failed to follow Humphrey's recommendations.

The father complied, although not initially, with the step to sign releases authorizing department personnel to communicate with service providers to monitor attendance, cooperation and progress made toward identified goals and for future use in court.

The father was to maintain adequate housing and legal income. The court found that the father shares a home with his mother and his grandmother, but the adequacy of his apartment has never been demonstrated. Prior to December 8, 2006, the father was employed as a night stock clerk in a grocery store. He

lost that employment when he chose to attend a concert instead of going to work. The father remained unemployed until he recently obtained part-time employment at McDonald's. The father receives social security disability payments. He represented that his disability arose from an automobile accident that resulted in a permanent disabling injury to his cervical discs. The father told Humphrey that he experiences pain "constantly," but the father has refused to sign a release for the department to obtain his social security records to confirm his disability. Notwithstanding his disability, the father participates in BMX bike riding as a hobby. He testified that he continues to ride BMX bikes but that he does not go over jumps, although a photograph of him doing so was entered into evidence.

The father was to meet and to address the children's physical, educational, medical or emotional needs on a timely and consistent basis. Among other things, he was to keep the children's appointments with medical, psychological, psychiatric or educational providers. He also was to attend their regularly scheduled pediatric appointments. He attended two pediatric appointments with Joseph, Jr., and Daniel, but he failed to attend a scheduled pediatric appointment on April 24, 2007.

The father was ordered to advise department personnel immediately of any changes in the composition of his household to ensure that such changes would not compromise the health and safety of his children. Departmental personnel learned of the composition of the father's household in November, 2006. He has been relatively compliant with this step although department personnel believe that the mother occasionally has resided with him in violation of court-ordered steps.

The father has complied with the step that he visit with his children as often as permitted by department personnel. Initially, he visited his children for two hours

twice a week. Following Humphrey's evaluation of February 3, 2006, the visits were expanded to six hours twice a week. The length of the visits was later shortened.

With respect to various other steps, the court found that they were inapplicable or that the father had complied with them. The father was not involved with the criminal justice system and had not engaged in substance abuse. He also did not take the children from the state of Connecticut during the pending proceedings.

To terminate parental rights, the petitioner must prove by clear and convincing evidence the statutory element requiring the department to make "reasonable efforts to locate the parent and to reunify the child with the parent . . . unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . . ." General Statutes § 17a-112 (j) (1); see also *In re Christopher B.*, supra, 117 Conn. App. 779–80. Section 17a-112 (j) (1) "imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004). The court found that the department had made reasonable efforts to reunify the father with his children but that he repeatedly, by his own volition, failed to engage in and to take advantage of

the services offered or referrals made by department personnel.

On appeal, the father claims that the department was in violation of the statute when it stopped providing him with services after the children were adjudicated neglected in August, 2007, although he was permitted to continue visiting Joseph, Jr., and Daniel. He claims that his situation is similar to those in *In re Vincent B.*, 73 Conn. App. 637, 640–41, 809 A.2d 1119 (2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003), in which the minor child's father appealed from the termination of his parental rights, claiming that the department failed to make reasonable efforts to reunify him with his son when it stopped offering services, other than visitation.[14] Id., 639–40. In reversing the termination of the father's parental rights in *In re Vincent B.*, this court stated that a respondent's "history of not availing himself of services as well as the [petitioner's] filing of the petition to terminate his parental rights did not relieve the department of a continuing duty to make reasonable efforts." Id., 644. Although that rule of law applies in all termination of parental rights cases, the facts of *In re Vincent B.* are quite different from the facts here.

In *In re Vincent B.*, the father successfully participated "in a lengthy treatment program in May, 2001, [and] regularly visited with [the child]. [Melody Carr, a department social worker] testified that [the father] was consistent in visiting with [the child], that he acted appropriately with [the child] at those visits and that

---

[14] In *In re Vincent B.*, supra, 73 Conn. App. 642–45, the father had failed to avail himself of services to treat a lengthy alcohol addiction. His parental rights as to two of his other children were terminated in April, 1999, and February, 2000, respectively. The father thereafter voluntarily entered treatment, and, during that time, the petitioner sought to terminate his parental rights as to Vincent B. and offered the father no services and made no efforts at reunification.

both [the child] and [his father] demonstrated affection for one another. [The father] voluntarily had sought and received substance abuse, anger management and depression counseling. The record shows no evidence of relapses in those areas. [Nancy Randall, a psychologist] noted in her report that [the father] intended to repair the problems in his family life and to care for his children. Furthermore, John McKeithen, a substance abuse counselor who worked with [the father] during his treatment program, testified that [the father's] participation in treatment and willingness to stay sober was motivated by a desire to 'get his family back.' " Id.

In this case, the father left the state when the mother was about to give birth to Joseph, Jr., to avoid department intervention in their lives. The father apparently was unaware of or ignored the mother's obvious mental health and medical issues or the needs of a newborn. When Joseph, Jr., was born in Pennsylvania, however, medical providers and child protection authorities, individuals not previously familiar with the respondents, immediately recognized that Joseph, Jr.'s safety and welfare were at risk within a day or two of his birth. Joseph, Jr.'s custody was transferred to the petitioner on the basis of predictive neglect. See *In re T.K.*, 105 Conn. App. 502, 513, 939 A.2d 9, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

The record is replete with numerous services offered to the father. The court found that the father was openly hostile and resistant to assistance from department personnel and refused to cooperate with them and service providers. He was discharged from every service for unsuccessful participation. In November, 2006, the father began weekly appointments with Corson, a psychologist specializing in the treatment of individuals with personality disorders. The father, however, missed appointments without giving notice and sometimes refused to talk. Corson tried to accommodate the

father's schedule and circumstances. In 2007, the father refused to see Corson and was discharged. Department personnel persuaded Corson to see the father again. Corson agreed, and, at their only reconvened session on November 10, 2007, the father informed Corson that he did not believe in psychology, thought it was pseudo-science and that he was present against his will. Corson discharged the father once again and advised department personnel that "further therapeutic interventions with this client would be fruitless." On the basis of this record, I cannot conclude that the court's finding that the father was unwilling or unable to benefit from services was clearly erroneous.

I would affirm the judgments.