******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE MINDY F.*
(AC 36696)

DiPentima, C. J., and Sheldon and Dupont, Js.

*Argued September 15—officially released November 20, 2014***

(Appeal from Superior Court, judicial district of New Haven, Juvenile Matters, Cronan, J.)

*Alison P. Gaston*, for the appellant (respondent father).

*Renée Bevacqua Bollier*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Benjamin Zivyon*, assistant attorney general, for the appellee (petitioner).

*Thomas B. Pursell*, for the minor child.

*Opinion*

DiPENTIMA, C. J. The respondent father, Jason F. (father), appeals from the judgment of the trial court terminating his parental rights as to his child, Mindy F.[1] On appeal, the father claims that the trial court improperly: (1) concluded that he had failed to achieve a sufficient degree of personal rehabilitation within the meaning of General Statutes § 17a-112 (j) (3) (B) (i); (2) determined that the termination of his parental rights was in Mindy's best interest; (3) denied his motion to transfer guardianship to the child's paternal great aunt; and (4) approved a permanency plan calling for the termination of his parental rights before holding a full evidentiary hearing on that issue, as required by General Statutes § 46b-129 (k) (1). We affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. On April 15, 2011, the petitioner, the Commissioner of Children and Families (commissioner), filed a neglect petition alleging, inter alia, that Mindy was being denied proper care and was being permitted to live under conditions injurious to her well-being. Mindy, who was born in January, 2010, was approximately fourteen months old at the time. On September 2, 2011, the commissioner filed a motion for temporary custody, alleging that Mindy had been injured as a result of an automobile accident.[2] The commissioner further alleged that Mindy's mother, who was a passenger in the car at the time of the accident, was under the influence of alcohol at that time. At the time of the accident, the father was incarcerated. The court granted the motion and issued specific steps for the father to take in order to reunify him with Mindy. He was also advised of the need to comply with the specific steps.

Mindy was adjudicated neglected by the court on December 6, 2011.[3] On January 30, 2012, the father, who had been released from prison, was arrested for possession of narcotics, and sentenced to one year in prison. Mindy was committed to the care and custody of the commissioner on March 5, 2012. On June 1, 2012, the commissioner filed a motion to review the permanency plan for Mindy that contemplated the termination of the father's parental rights and her subsequent adoption (initial permanency plan). The court approved the initial permanency plan on August 6, 2012, and ordered the commissioner to file a petition for termination of parental rights within sixty days. On October 5, 2012, the commissioner filed such a termination petition. On November 15, 2012, the father filed a motion seeking to transfer guardianship and custody of Mindy to her paternal great aunt, who had been granted intervenor status by the court. On May 3, 2013, the commissioner filed a motion to review a second permanency plan that continued to contemplate termination of the father's

parental rights and a subsequent adoption (second permanency plan). The father filed an objection to the second permanency plan on June 13, 2013.

The hearings on the motion to transfer guardianship and the motion to review the second permanency plan were consolidated with the termination of parental rights trial. The consolidated proceedings began on September 9, 2013, and then continued on September 10 and 12, 2013, and January 15 and 29, 2014. On January 29, 2014, the commissioner requested that the court approve the second permanency plan. At that point in the consolidated proceedings, the commissioner had rested, but the father had not yet begun to present his evidence. Before ruling, the trial court inquired whether "anyone want[ed] to be heard on the [second permanency] plan." In response, the father stated to the court that he had "filed an objection to the plan earlier on and I still object to the plan."[4] The father, however, did not request the opportunity to offer any witnesses in support of his objection before the court ruled. The court overruled the objection and approved the second permanency plan. The father then presented his evidence and a posttrial brief in opposition to the termination petition.

At the conclusion of the termination trial, the court issued a written memorandum of decision, outlining its findings. As to the adjudicatory phase of the proceedings, the trial court found by clear and convincing evidence that the Department of Children and Families (department) "ha[d] made reasonable efforts to reunify the family, but that the [father is] unwilling or unable to fully benefit from reunification services at this time," and that the father had "failed to achieve the degree of personal rehabilitation that would foster the belief that within a reasonable period of time, considering the age and needs of the child, [he] could assume a responsible position in the child's life."

As to the dispositional phase of the proceedings, the court first considered and then made written findings pursuant to § 17a-112 (k). Specifically, the court found that the department had made reasonable efforts to reunite Mindy and the father, and that the services offered were "timely and extensive." The court also concluded that the father had been incarcerated for a "good part of the time" and, as a result, was unable to comply with the specific steps. In addition, the court determined that Mindy had been residing with her foster mother since September 2, 2011, and that her emotional attachment to her birth parents was "unclear." Ultimately, the court concluded by clear and convincing evidence that the termination of the father's parental rights was in the best interest of Mindy. The court also denied the father's motion to transfer guardianship to the paternal great aunt. This appeal followed.[5]

We begin by setting forth the statutory requirements

for granting a petition for the termination of parental rights. "A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists [by clear and convincing evidence], it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." (Internal quotation marks omitted.) *In re Roshawn R.*, 51 Conn. App. 44, 52, 720 A.2d 1112 (1998).

"Our standard of review on appeal from a termination of parental rights is limited to whether the challenged findings are clearly erroneous. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . [G]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather,] every reasonable presumption is made in favor of the trial court's ruling." (Internal quotation marks omitted.) *In re Jah'za G.*, 141 Conn. App. 15, 30, 60 A.3d 392, cert. denied, 308 Conn. 926, 64 A.3d 329 (2013).

I

In his first claim, the father challenges the trial court's finding that he failed to rehabilitate within the meaning of § 17a-112 (j) (3) (B) (i). Specifically, the father claims that he has made significant progress in achieving sufficient personal rehabilitation by seeking out and successfully completing multiple substance abuse treatment programs, earning his general equivalency diploma, taking parenting classes, and obtaining gainful employment and stable housing. This progress, the father contends, establishes that he could have assumed a responsible position in Mindy's life, and that the findings of the trial court to the contrary are clearly erroneous. We disagree.

Pursuant to § 17a-112 (j) (3) (B) (i), the court may grant a petition to terminate parental rights only after it has determined, by clear and convincing evidence, inter alia, that the "parent . . . has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129 and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"In making that determination, the proper focus is on the parent's demonstrable development in relation to the needs of the child. As we have observed: [i]n

assessing rehabilitation, the critical issue is not whether the parent has improved [his] ability to manage [his] own life, but rather whether [he] has gained the ability to care for the particular needs of the child at issue. . . . Furthermore, our courts are required to construe liberally the provisions of § 17a-112 in the best interest of the child for whom a petition has been filed, rather than the parent thereof." (Citation omitted; internal quotation marks omitted.) *In re Emerald C.*, 108 Conn. App. 839, 853–54, 949 A.2d 1266, cert. denied, 289 Conn. 923, 958 A.2d 150 (2008). Moreover, as our cases have held, "even if a parent has made successful strides in [his] ability to manage [his] life and may have achieved a level of stability within [his] limitations, such improvements, although commendable, are not dispositive on the issue of whether, within a reasonable period of time, [he] could assume a responsible position in the life of [his] child." (Internal quotation marks omitted.) *In re Kristy A.*, 83 Conn. App. 298, 318, 848 A.2d 1276, cert. denied, 271 Conn. 921, 859 A.2d 579 (2004).

The record in this case provides sufficient support for the court's determination that the father has failed to rehabilitate. Even though the court acknowledged that the father was "actively attempting to turn his life around," it nevertheless concluded that he had failed to achieve the necessary degree of personal rehabilitation. Specifically, the court found that the father "has not had sufficient time to establish a viable track record" to satisfy the statutory requirement. The court based its finding on the fact that the father "was incarcerated from January, 2012, and remained incarcerated for most of the period when the specific steps were to be implemented." The court heard testimony from Tomi Handy, a social worker employed by the department, that the father refused to have Mindy visit him while he was incarcerated and that only "nearing the end of his jail sentence" did he begin having monthly visits with her.[6] In addition, the evidence before the court included the expert testimony of Ines Schroeder, a psychologist who conducted the court-ordered evaluation of the family. She testified that the father's ability to maintain sobriety and to avoid a substance abuse related relapse remained uncertain because "[he has] only had a few months of time of sobriety outside of a controlled setting . . . ." Additionally, Schroeder expressed concerns about the father's ability to be "a strong advocate for Mindy if she should be in his care," as well as the degree of his understanding of Mindy's psychological health and related attachment issues. Schroeder's ultimate recommendation was the termination of parental rights and the eventual adoption of Mindy by her foster family.

Having reviewed the record before us, we conclude that the court's finding that the father failed to achieve a sufficient degree of personal rehabilitation was not clearly erroneous. The evidence presented at trial is sufficient to support the finding, and we are not left

with the definite and firm conviction that a mistake has been made. See, e.g., *In re Sheila J.*, 62 Conn. App. 470, 481–82, 771 A.2d 244 (2001) (respondent's efforts at rehabilitation "too little and too late," and court's finding that she failed to achieve sufficient rehabilitation despite some level of stability not clearly erroneous).

## II

The father next claims that the court erred by finding that the termination of his parental rights was in Mindy's best interest. Specifically, he argues that the court improperly: (1) concluded that the department had provided timely and appropriate services to him; (2) determined that the department had made reasonable efforts to reunite him with Mindy; (3) failed to consider the emotional ties between Mindy and him; and (4) found that he had not been prevented from maintaining a meaningful relationship with the child because of an unreasonable act or conduct of any other person.[7] We are not persuaded.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of [her] environment. . . . [T]he trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)]. . . . The seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Internal quotation marks omitted.) *In re Alison M.*, 127 Conn. App. 197, 211, 15 A.3d 194 (2011). "As with the findings made in the adjudicatory phase, we reverse the court's determination of the best interest of the child only if the court's findings are clearly erroneous." *In re Albert M.*, 124 Conn. App. 561, 566, 6 A.3d 815, cert. denied, 299 Conn. 920, 10 A.3d 1050 (2010). A review of the record convinces us that the court properly made findings pursuant to the mandated statutory factors and that its ultimate conclusion with respect to the best interest of Mindy was not clearly erroneous.

## A

As to the first statutory factor, the father claims the court improperly concluded that the department had provided timely and appropriate services to him. Initially, the court determined that the department provided the father with "timely and extensive" services, including "assistance with visitation, parenting, [and]

outpatient substance abuse and mental health services." The evidence supports the court's findings as to the father. During the trial, Laura Selsky, a social worker employed by the department, testified that the father was referred to participate in "an intensive reunification program" in which his participation had been minimal because it purportedly conflicted with his work schedule. She further testified that the father was referred for individual substance abuse counseling, in which he remained engaged, however, he was later arrested in January, 2012, for possession of narcotics. Additionally, both Selsky and Handy testified that the father had been offered the opportunity to have visitations with Mindy while he was incarcerated, but that he had refused to see her until near the end of his sentence.

Nevertheless, the father maintains that the department "did not give timely and appropriate services [because] it failed to increase [his] visitation when requested." The father, however, does not provide sufficient support to corroborate his claim. The two motions for increased visitation offered to substantiate his claim were filed with the trial court, but the record contains no evidence that a similar request was made to the department.[8] There is no support for the father's claims that the department "had written [him] off" and had "delayed, acting as if termination was a fait accompli."[9] Absent any reliable evidence to the contrary, we conclude that the court's finding that the department provided timely and extensive services was not clearly erroneous.

B

The father next challenges the court's determination that the department made reasonable efforts to reunite him with Mindy. He maintains that, by ignoring his requests for increased visitation while he was incarcerated from January, 2012, to February, 2013, the department did not provide him with adequate access to Mindy. The record, once again, offers sufficient support for the trial court's finding that the department's efforts were "relevant, available, adequate and accessible." As with the father's previous claim, this claim also is not supported by the evidence in the record. To the contrary, the testimony at trial established that, during his incarceration, the father had declined visits from Mindy for a period of "several months," and that the visits only began once the father changed his mind and decided to allow Mindy to visit him in prison. Accordingly, we find no error in the court's finding. See *In re Kyara H.*, 147 Conn. App. 855, 873, 83 A.3d 1264 (collecting cases affirming conclusion that department made reasonable effort at reunification "in light of the fact that the [parent] rejected many of the services"), cert. denied, 311 Conn. 923, 86 A.3d 468 (2014).

C

The father next argues that the court did not give proper consideration to the emotional ties between Mindy and himself. The court found: "Mindy has been residing with her foster mother since September 2, 2011. She has had regular visits with her mother and more recently with [the] father." The court concluded, however, that "Mindy is often resistant to attending visits and the emotional attachment to her parents is unclear." The court heard testimony from multiple witnesses supporting its finding. Selsky testified about the father's initial refusal to visit with Mindy while he was incarcerated and his minimal participation in the family reunification program after he was released. Schroeder testified that she had observed Mindy being shy towards, and not wanting to engage with, the father. She also testified that Mindy resisted contact with the father "[e]very time that he attempted to engage [her] physically, either [by] pick[ing] her up or hug[ging] her or kiss[ing] her . . . ." Ultimately, Schroeder opined that a parent-child relationship between Mindy and the father was not "evident." In addition, Handy testified that, even though Mindy enjoyed seeing her father and called him "daddy," she nevertheless identified herself with the foster family and saw visitations with the father as "a play date." Handy also testified that on occasions when she observed Mindy get hurt or otherwise require some comfort or security, she would reach out to her "foster mom," even when the father was present.

The father argues that the trial court erred because it did not properly consider testimony that described his bond with Mindy in a more favorable way.[10] It is well settled, however, that the function of the reviewing court is "to review and not to retry the proceeding of the trial court. . . . The probative force of conflicting evidence is for the trier to determine. . . . We defer to the trier of fact's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. The trier is the judge of the credibility of all the witnesses and the weight to be given their testimony, and may accept part, all or none of the testimony. . . . Where . . . the record reveals that the trial court's ultimate conclusions are supported by clear and convincing evidence, we will not reach an opposite conclusion on the basis of any one segment of the many factors considered in a termination proceeding." (Citation omitted; internal quotation marks omitted.) *In re Victoria B.*, 79 Conn. App. 245, 262–63, 829 A.2d 855 (2003). Thus, our review of the record in this case leaves us convinced that the court's finding was not in error.

D

The father next argues that the court erred in its finding that he had not been prevented from maintaining a meaningful relationship with Mindy because of the unreasonable act or conduct of any other person. The

father maintains that the department "created a roadblock to visitation which prevented [him] from 'maintaining a meaningful relationship' with Mindy." As with his previous claims, the father offers no evidence to support this claim, and our review of the record reveals none. On the contrary, the evidence in the case supports the court's finding.

In its memorandum of decision, the court found by clear and convincing evidence that Mindy's best interest would be served by terminating the father's parental rights. Our review of the record in this case leaves us convinced that the trial court's findings were supported by the record, and, thus, were not clearly erroneous.

### III

The father next claims that the court erroneously denied his motion to transfer guardianship to Mindy's paternal great aunt.[11] Specifically, the father claims that the court erred by denying that motion based only on its determination as to the best interests of the child pursuant to General Statutes § 46b-57, without making any finding as to whether the proposed guardian was "suitable and worthy," as mandated by General Statutes § 46b-129 (j) (2) (C). We are not convinced.

In order to resolve the father's claim, it is necessary for us to examine and assess the applicability of the statute and Practice Book provision upon which the father bases his claim, namely, § 46b-129 (j) (2) and Practice Book § 35a-12A.[12] "[I]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) *In re Avirex R.*, 151 Conn. App. 820, 828, 96 A.3d 662 (2014).

As we have previously held, properly granting a motion to transfer guardianship under subsection (j) of § 46b-129,[13] requires a two step analysis. "[T]he court must first determine whether it would be in the best interest[s] of the child for guardianship to be transferred from the petitioner to the proposed guardian. . . .

[Second,] [t]he court must then find that the third party is a suitable and worthy guardian." (Citations omitted.) Id., 834. This principle is echoed in Practice Book § 35a-12A (d), which provides that "the moving party has the burden of proof that the proposed guardian is suitable and worthy and that transfer of guardianship is in the best interests of the child." See also *In re Averiella P.*,146 Conn. App. 800, 804, 81 A.3d 272 (2013) (applying best interests standard to motion to transfer guardianship).

In his brief to this court, the father attempts to place significance on the order in which the required findings must be made. The father maintains that the court should have made the determination of "whether the proposed guardian is a suitable and worthy caregiver" before proceeding to the best interests determination because "a suitable and worthy caregiver can be an integral part of determining what is in the best interests of the child." We do not find his argument to be persuasive. Neither the language of § 46b-129 (j) (2) nor that of Practice Book § 35a-12A (d) requires such an integration of the suitability and worthiness of the guardian into the best interests analysis. What is required is that a party seeking to transfer guardianship must satisfy both requirements, and, thus, the failure to satisfy either one necessarily precludes the transfer of guardianship.

In this case, the court determined that Mindy's best interests would not be served by the transfer of guardianship to the paternal great aunt because the child "ha[d] a safe, secure bond and attachment to her current caregivers, and that her removal from their care would [have been] traumatic . . . ." Once this finding was made by the court, the father could not prevail on his motion. We conclude that, once it was determined that the transfer was not in Mindy's best interests, the court was not required to make any further findings, as the denial of the motion to transfer guardianship was required by law.

IV

The father's final claim is that the trial court erroneously approved the second permanency plan contemplating termination of his parental rights before holding a full evidentiary hearing on the issue as required by § 46b-129 (k) (1). We note that he failed to bring this matter to the attention of the trial court. On appeal, the father argues that the judgment of the trial court terminating his parental rights should be reversed because the premature approval of the second permanency plan deprived him of a fair trial, which is plain error that resulted in manifest injustice.[14] Alternatively, the father seeks review of this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We are not persuaded by his arguments.

We begin by setting forth the applicable standard of

review. Practice Book § 60-5 provides in relevant part that the reviewing court "may in the interests of justice notice plain error not brought to the attention of the trial court." "[P]lain error review is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . A defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice." (Internal quotation marks omitted.) *In re Justice V.*, 111 Conn. App. 500, 508, 959 A.2d 1063 (2008), cert. denied, 290 Conn. 911, 964 A.2d 545 (2009).

The statutes governing permanency plans, including § 46b-129 (k), were adopted to comply with federal law regulating state access to federal funding for children who have been removed from their parents. *In re Darien S.*, 82 Conn. App. 169, 174, 175–76, 842 A.2d 1177, cert. denied, 269 Conn. 904, 852 A.2d 733 (2004). Congress requires that, in order to continue to receive federal funds, states must review their permanency plans every twelve months. 42 U.S.C. § 622 (a) and (b) (8) (A) (ii) (2012). In addition, Congress also requires states to "make specific choices about the appropriate permanent placement of children in their care by specifying whether the child will be returned to a parent, placed for adoption, placed with a relative, referred to legal guardianship or, if a compelling reason is shown, placed in another planned permanent living arrangement." *In re Darien S.*, supra, 175. These, and other, federal requirements were codified by our legislature in § 46b-129.

Section 46b-129 (k) (1) provides in relevant part that the "court shall hold evidentiary hearings in connection with any contested motion for review of the permanency plan and credible hearsay evidence regarding any party's compliance with specific steps ordered by the court shall be admissible at such evidentiary hearings. . . ." The plain language of the statute is unambiguous; the trial court must hold evidentiary hearings before approving any contested permanency plan.

"Parents have a constitutionally protected right to raise and care for their own children. . . . Where the legislature has chosen specific means to effectuate a fundamental right, failure to follow the mandatory provisions of the statute is plain error. . . . It is plain error for a trial court to fail to apply an applicable statute, even in the absence of the statute having been brought to its attention by the parties." (Citations omitted; internal quotation marks omitted.) *In re Justice V.*, supra, 111 Conn. App. 507. In this case, the court erroneously approved the permanency plan without affording the father an opportunity to present evidence in opposition to the plan. This conclusion, however, does not end

our analysis; the father still has to demonstrate that this error resulted in manifest injustice. See id., 508. We conclude that he has failed to do so.

In this case, the petition to terminate the father's parental rights was filed pursuant to the initial permanency plan approved on August 6, 2012.[15] The father does not claim that the termination proceedings, initiated under the initial permanency plan, had to be suspended until the hearing on the second permanency plan could be held. Additionally, there is no indication that he challenged or opposed consolidating the hearing on the second permanency plan with the termination proceedings. Moreover, the father did not raise any procedural objection during the termination proceedings. He does argue, however, that because "[a] permanency plan determines whether [termination proceedings are] appropriate in the first instance," the judgment of the court terminating his parental rights should be reversed as it was based on an improper prior finding. To support his claim, the father cites *In re Joseph W.*, 121 Conn. App. 605, 607, 997 A.2d 512 (2010), aff'd, 301 Conn. 245, 21 A.3d 723 (2011), in which we reversed the trial court's judgment terminating the respondent's parental rights because it was premised on an improper adjudication of neglect.[16] We conclude that the rationale in *In re Joseph W.* is inapplicable here. In *In re Joseph W.*, supra, 621, the trial court's decision was reversed because the adjudication of neglect was used as a prerequisite to the termination proceeding. The error during the neglect proceedings resulted in a flawed termination of parental rights. Id.

In this case, however, the ultimate decision to terminate the father's parental rights was not premised on the premature approval of the permanency plan. Instead, the court reached its ultimate determination only after all of the evidence and testimony in the termination case was presented by all parties. The father does not argue that the erroneous ruling by the court regarding the second permanency plan prevented him from introducing any additional evidence at trial. To the contrary, the record reflects that he presented evidence and multiple witnesses at trial to support his position opposing the termination of his parental rights. In fact, the court considered this evidence and credited the father's efforts to turn his life around, as demonstrated by the evidence, but found that the father's efforts were insufficient.[17] Ultimately, the court concluded that the commissioner had proven that the termination of the father's parental rights was in Mindy's best interest by clear and convincing evidence—a higher standard of proof than that required for approval of a permanency plan. See Practice Book § 35a-14 (d) (whether permanency plan in best interests of child must be proven by preponderance of evidence). Because the court's finding as to the best interests of Mindy was made by clear and convincing evidence, the father would not

have been able to prevail in opposing the second permanency plan, which needed to be proven only under a preponderance standard.

Similar reasoning leads us to conclude that the father's claim fails under the third prong of the *Golding* test.[18] We base our conclusion that there is no clear constitutional violation and the father was not deprived of a fair trial on the following previously discussed factors. The termination proceedings were initiated under the initial permanency plan approved in August, 2012, and their suspension pending the approval of the second permanency plan was not required. The father was able to present his case during the termination proceedings. The court reached its final conclusion to terminate the father's parental rights only after he had presented his entire case to the court. Finally, the court determined that it was in Mindy's best interest to terminate the father's parental rights by applying the higher standard of proof, namely, clear and convincing evidence, during the dispositional phase of the termination trial. We conclude that the father failed to prove that he was deprived of a fair trial due to the premature approval of the second permanency plan. Accordingly, his final claim must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** November 20, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The trial court also terminated the parental rights of Mindy's mother, Cindy T., during the same proceedings. The mother, however, is challenging the trial court's decision in a separate appeal. See *In re Mindy F.*, 153 Conn. App. , A.3d (2014).

[2] The testimony at trial established that, as a result of this accident, Mindy sustained a physical trauma that requires constant medical monitoring.

[3] The court granted the commissioner's motion to amend the neglect petition to include the circumstances surrounding the accident.

[4] The mother as well as the paternal great aunt also filed their objections to the second permanency plan.

[5] On appeal, the attorney for the minor child adopted the commissioner's brief.

[6] Although it is understandable that a parent might not wish to have his child view him in prison surroundings, the overriding fact is that, by refusing visitation, he risks negatively affecting the relationship with his child.

[7] General Statutes § 17a-112 (k) provides in relevant part that a court shall consider and make written findings regarding: "(1) [t]he timeliness, nature and extent of services offered . . . to the parent and the child . . . (2) whether the [d]epartment . . . has made reasonable efforts to reunite the family . . . (3) the terms of any applicable court order entered into . . . and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents . . . and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future . . . and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship

with the child by . . . the unreasonable act of any other person . . . ."

[8] The record does not indicate that the trial court took any action on the motions.

[9] Moreover, the court filings indicate that the father's visits with Mindy were increased from one visit per month when he was incarcerated, to four hourly visits per month shortly after he was released from prison. This increase occurred approximately two months after the second motion for increased visitation had been filed. In addition, the court file indicates that the father's visits were increased once more after the conclusion of the termination proceedings upon a negative drug use test result.

[10] At trial, Nicole Burman, who provided transportation and supervised visits after being referred by the department, testified that she observed the demeanor between the father and Mindy grow "more positive as they . . . redevelop[ed] a relationship." In addition, the paternal great aunt also testified that she had observed mutual affection displayed between Mindy and the father.

[11] We note that the father's appeal form does not indicate that he has appealed from the ruling on the motion to transfer, which was included in the trial court's memorandum of decision terminating the father's parental rights. In *Rocque* v. *DeMilo & Co.*, 85 Conn. App. 512, 526–28, 857 A.2d 976 (2004), this court concluded that, because the appellant failed to appeal from a ruling, it had no jurisdiction to review that claim. Thereafter, our Supreme Court in *Pritchard* v. *Pritchard*, 281 Conn. 262, 277, 914 A.2d 1025 (2007), distinguished *Rocque*, noting that in *Rocque* there was no indication of an intent to challenge the ruling until the appellate brief had been filed. Here, as in *Pritchard*, the intent of the father to appeal from the denial of the motion to transfer was clear. The father's preliminary statement of issues filed with the appeal form included the claim relating to the transfer of guardianship ruling. Following *Pritchard*, we address the claim.

[12] In the father's reply brief to this court he argues Practice Book § 35a-20 (e) provides the relevant test. This section, however, applies to a postdisposition transfer of guardianship. Practice Book § 35a-12A applies to predisposition transfers.

[13] "After a child has been found to be neglected or abused, § 46b-129 (j) (2) grants a court four dispositional options: [T]he court may (A) commit such child or youth to the Commissioner of Children and Families, and such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court; (B) vest such child's or youth's legal guardianship in any private or public agency that is permitted by law to care for neglected, uncared-for or abused children or youths or with any other person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage; (C) vest such child's or youth's permanent legal guardianship in any person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage in accordance with the requirements set forth in subdivision (5) of this subsection; or (D) place the child or youth in the custody of the parent or guardian with protective supervision by the Commissioner of Children and Families subject to conditions established by the court." (Internal quotation marks omitted.) *In re Avirex R.*, supra, 151 Conn. App. 829.

[14] As an alternative to the reversal of the judgment terminating his parental rights, the father seeks a remand for a full evidentiary hearing on the second permanency plan. Because we affirm the court's termination of the father's parental rights, we need not consider the father's request for a new hearing on the second permanency plan, as no practical relief is available to him in ordering such a hearing. See *Hechtman* v. *Savitsky*, 62 Conn. App. 654, 659, 772 A.2d 673 (2001) ("[i]n determining mootness, the dispositive question is whether a successful appeal would benefit the [appellant] in any way").

[15] The father does not challenge the approval of the initial permanency plan on appeal.

[16] In *In re Joseph W.*, supra, 121 Conn. App. 612, 621, the trial court precluded the father from participating during the neglect proceedings because it erroneously concluded that, as a noncustodial parent, the father was not entitled to contest the neglect petition. Subsequently, the children were adjudicated neglected by the trial court, and this adjudication was used at a later termination of parental rights proceedings. Id., 612. This court reversed the termination of parental rights, concluding that it was based on an improper adjudication of neglect because the father had the

right to contest the neglect proceedings. Id., 621.

[17] We also reject the father's claim that the court's premature approval of the second permanency plan "foreshadowed the outcome of the termination of parental rights trial." In his brief, the father does not direct us to any evidence, and our review of the record uncovered none, showing that the court referred to or relied on its prior best interests determination in approving the permanency plan as a basis for making its ultimate best interest determination in the termination trial. Without such proof, the father's accusations are without merit. Further, to the extent this claim suggests judicial bias, we express our disapproval of making such an unsupported claim that was never raised to the trial court. See *Burns* v. *Quinnipiac University*, 120 Conn. App. 311, 316, 991 A.2d 666 ("Our Supreme Court has criticized the practice whereby an attorney, cognizant of circumstances giving rise to an objection before or during trial, waits until after an unfavorable judgment to raise the issue. We have made it clear that we will not permit parties to anticipate a favorable decision, reserving a right to impeach it or set it aside if it happens to be against them, for a cause which was well known to them before or during the trial." [Internal quotation marks omitted.]), cert. denied, 297 Conn. 906, 995 A.2d 634 (2010).

[18] Pursuant to *Golding*: "[An appellant] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the [appellant] of a fair trial; and (4) if subject to harmless error analysis, the [appellee] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the [appellant's] claim will fail. The appellate tribunal is free, therefore, to respond to the [appellant's] claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

————————————————